60　19
97　86

# Allen *v.* The State.

## *Indictment for Murder.*

1. *Oath of petit jurors.*—In a criminal case, where a special jury is impanneled, it is the better practice to swear each juror separately as he is selected; but, where the record shows that each was sworn separately, and all were afterwards collectively sworn, the oaths administered being substantially the same as prescribed by the statute (Code of 1876, § 4765), this is not erroneous.

2. *Impeaching witness by proof of weak mind or memory.*—When a witness in a criminal case, testifying as to facts which occurred immediately before and after a homicide committed two years previously, admits that he can not "step off one hundred yards and count it—that he would forget how far he had gone before he counted a hundred"—and his testimony otherwise shows weakness of mind, there is no error in refusing to allow him to be asked, on cross-examination, as to his superstitious notions concerning the effects of certain roots: such evidence is too remote from the issue, and does not tend to show that he was not a good observer of facts, and faithful in narrating them; nor is it erroneous to refuse to let him be asked. "for the purpose of testing his recollection," whether he did not swear, on the prisoner's application for bail several months before, "that he was weak-witted." (MANNING, J., dissenting as to the latter proposition.)

3. *Declarations made by defendant immediately after commission of homicide.*—Declarations or statements, explanatory and exculpatory, made by the defendant immediately after the commission of the homicide, to the first persons who came up, and admitted on the trial, without objection, as a part of the res gestæ, are not governed by the rules which apply to confessions, and it is not necessary that the record should affirmatively show that, before they were admitted. they were proved to have been made freely and voluntarily.

4. *Charges as to imminent danger, or apprehension thereof.*—*Held,* that the following charges were calculated to mislead the jury, and were properly re-

fused: "That if the jury have a reasonable doubt whether the circumstances were such as to impress the mind of a reasonable man that he was in great danger of great bodily harm at the time of the killing, they must give the prisoner the benefit of that doubt, and acquit him;" "That if the circumstances were such as to create a reasonable belief in the mind of the accused that his danger was imminent, then the law says he may strike in self-defense."

FROM the Circuit Court of Marengo, on change of venue from Choctaw.

Tried before the Hon. LUTHER R. SMITH.

The prisoner in this case, Brad Allen, was indicted for the murder of Frank Allen, his brother. The trial was removed, on his application, from Choctaw to Marengo county; and on his trial in the latter county, in May, 1878, he was convicted of manslaughter in the first degree, and sentenced to the penitentiary for seven years. "On the trial," as the bill of exceptions states, "the jurors having been drawn and summoned according to law, as each juror was drawn, he was sworn to answer questions; and having been passed on and accepted, the following oath was administered to each: 'You do solemnly swear, that you will well and truly try all issues, and execute all writs of inquiry, which may be submitted to you during the present day of court, and true verdicts render according to the evidence: so help you God.' After the full jury had been passed upon and accepted, and separately sworn as above stated, the court, of its own motion, directed the jury to stand up, and the clerk administered to them in a body the following oath: 'You, and each of you, do solemnly swear, that you will well and truly try the issue joined between the State of Alabama and Brad Allen, the defendant now at the bar, and a true verdict render according to the evidence: so help you God.' The defendant's counsel made no objection, but remarked, that the Supreme Court had said the oath should be administered to each juror as he was passed on."

The deceased and the defendant lived together on the same plantation, and in the same house; and no other white person lived on the place. The homicide was committed early in the morning, when no other person was present; and they both had been drinking, if they were not actually drunk at the time. It appeared from the testimony of several negroes who were employed as laborers by the two brothers, and who were examined as witnesses on the part of the prosecution, that Brad Allen, the defendant, a few minutes before the shooting, sent Henry Brown, with Margaret Jones, to go and catch a pony for the said Margaret; and on his delay in starting, the defendant "caught him by the collar, cursed him, and said he would shoot his head off, if he did not go

and get the pony." Just then, Frank Allen came up, and asked, "What is the matter?" or, "What is this fuss about?" Thereupon, as one of the witnesses testified, "Brad Allen turned to him, and said, 'Do you take it up?' to which Frank Allen replied, 'No,' and walked off." Another witness said, "that when Frank came up, and asked what was the matter, Brad Allen told him, he wanted Henry to go after the pony, but he seemed slow about starting; that they both stepped off a little piece, and were talking together friendly; that they did not quarrel at all when Frank came up." A third witness testified, "that when Frank came up, and asked what was the matter, Brad told him he wanted Henry to go after the pony; that Frank said, 'I thought there was something the matter, as I could find no whiskey in the jug this morning;' that Frank said, also, he might let Henry get his breakfast first; that both of them seemed to be drinking, but were not drunk; that they seemed to quarrel at first; that Brad Allen had his hand up, and was gesturing excitedly with it; that Frank told him, if he did not take his fist out of his face, he would smack him over; that they seemed to become pacified, and began to laugh and talk friendly." Frank Allen had on a pair of pantaloons belonging to his brother, and told one of the servants to get him another pair, as he wanted to go to town; but Brad said, "You can keep on mine to-day, as I am going to stay at home." This was the substance of the testimony, as to what occurred between the two brothers just before the shooting. A few minutes afterwards, two reports of a pistol being heard, the servants came back to the house, and found Frank Allen lying on the floor, near the bed, partly undressed, and dead, having been shot through the head. His knife was lying on the floor, as Margaret Jones testified on the part of the defense, and was picked up by her; it was "a spaying knife, about five or six inches long, and was open." The testimony of the servants, as to what was said and done by the defendant when they ran back to the house, was also conflicting. Henry Brown said: "He and Margaret Jones had gone after the pony, and were returning, and had got in full view of the house, when he heard two pistol shots fired in quick succession, and saw Margaret Pruitt go up to the house; that he rode on towards the house, but, when he got near it, he turned his horse back and started to run; that Brad Allen called to him to come back, that he did not intend to hurt him, and said, '*I have done what I intended to do.*'" Kitty Allen said, that when she reached the house, the defendant said to her, "I have killed Frank;" that she then asked him, why he had done it; that he replied, "*Frank imposed on him;*" and that she then said

to him, "No, Mass' Brad, it was whiskey." Vicey Nunnerly, who was with Kitty Allen at that time, testified that the defendant told her, "*He had killed Frank because he imposed on him and Margaret Jones.*" Margaret Pruitt, a witness for the defense, testified : " When she got to the door, she met Brad Allen coming out; and he spoke to her, and said, "*I have killed Frank.*' She said, 'Have you killed him dead?' He said, ' *Yes, by God, I have killed him dead; but God knows, if I had not killed him, he would have killed me; and I would give the world, if I could breathe life back into him again.*'" There was no objection to any part of this evidence. Exceptions were reserved by the defendant to several rulings of the court on the coss-examination of Henry Brown, who was one of the witnesses for the prosecution, and whose testimony was, in several particulars, conflicting with that of other witnesses. The opinion states the material facts bearing on these questions. Dr. Allen, a brother of the defendant and the deceased, testified that the latter was a dangerous man— quick, irritable, aggressive, violent, and uncontrollable when excited; that the attachment between the two brothers was somewhat remarkable ; and that, in all their disputes, Frank was the aggressor, while the defendant was disposed to yield. Other witnesses testified to the same effect, as to the character of the two brothers, and the relations which existed between them.

" The court charged the jury orally, to which no exception was taken by the defendant. The defendant asked the following charges, which were in writing, and which the court gave : ' That unless the evidence against the prisoner should be such as to exclude to a moral certainty every supposition but that of his guilt of the offense imputed to him, the jury must find him not guilty.' 'That unless the evidence against the prisoner should be such as to exclude to a moral certainty every hypothesis but that of his guilt, they must find him not guilty.' 'That if there is any reasonable hypothesis arising from the evidence, consistent with the innocence of the defendant, they must find him not guilty.' 'That if the jury have a reasonable doubt whether the killing was done with malice, or under heat of blood in sudden quarrel, without malice, they must give the prisoner the benefit of this doubt.' 'That unless the evidence satisfies the jury beyond a reasonable doubt, and to a moral certainty, that the defendant killed the deceased with malice, they can not find him guilty of murder.' 'If a person, on trial for an alleged offense, offers no evidence of his good character, no legal inference can arise from such omission that his character is bad, or that he is guilty of the offense charged.' 'If there

is no evidence of the facts attending the killing, the jury are authorized to consider the defendant's declaration, 'that he done it to save his own life,' with the other evidence in the case, to enable them to determine who was the aggressor, and may, if sufficiently believed by the jury, generate a doubt of the defendant's guilt.'

"The defendant asked the court, also, to give the following charges, which were in writing, and which the court refused to give : 'If the jury have a reasonable doubt, whether the circumstances were such as to impress the mind of a reasonable man that he was in great danger of great bodily harm, at the time of the killing, they must give the prisoner the benefit of that doubt, and acquit him.' 'If the jury believe, from the evidence, that the circumstances were such as to create a reasonable belief in the mind of the accused that his danger was imminent, then the law says he may strike in self-defense ; and in determining this, the jury have a right to consider the character of the deceased as proved, with the other evidence in the case.' To the action of the court in refusing said charges the defendant excepted."

The court afterwards instructed the jury, on the request of the prosecuting attorney, "that 'unless the evidence against the prisoner should be such as to exclude to a moral certainty every supposition but that of his guilt of the offense imputed to him, then they must find him not guilty,' means only that they must be satisfied beyond a reasonable doubt of the defendant's guilt;" and "that 'the exclusion to a moral certainty of every hypothesis but that of the prisoner's guilt,' means only that the jury must be satisfied from the evidence, beyond a reasonable doubt, of his guilt;" to which additional charges the defendant excepted.

THOS. W. COLEMAN, for the prisoner.—In the organization of the jury, the record shows the proper oath improperly administered, and an improper oath properly administered. *Drake v. The State,* 51 Ala. 30, and authorities there cited. The record shows, also, that several different confessions of the prisoner were admitted in evidence against him ; and it fails to show that the necessary preliminary evidence was adduced.—*Bill Miller v. The State,* 40 Ala. 59. The questions propounded to Henry Brown, which the court suppressed, were calculated to impeach his testimony, by showing that his mind was disordered, and his memory very deficient. It was material to show this, since his testimony conflicted with that of other witnesses ; and no objection can be taken to the form of the questions. In the matter of the instructions to the jury, the court violated the principles

announced in *Oliver v. The State*, 17 Ala. 587; *Harrison v. The State*, 24 Ala. 67; *Noles v. The State*, 26 Ala. 31; *Eiland v. The State*, 52 Ala. 322.

JOHN W. A. SANFORD, Attorney-General, for the State.—The prisoner's declarations, made immediately after the commission of the homicide, were merely explanatory statements, constituting a part of the *res gestœ*, and were admitted without objection. The charges asked and refused were calculated to mislead the jury, and did not assert correct legal propositions.—*Adams v. The State*, 52 Ala. 379. They might have been refused, because they were abstract.

MANNING, J.—There was no error in the swearing of the jury. The two oaths were substantially the same. The usual practice is to swear each juror as he is selected, and that is the better practice. In this instance, they were sworn first singly, and afterwards collectively.

2. One of the State's witnesses, a negro man, testified to many particulars, some occurring at different times, adverse to the defendant below; and being cross-examined, he confessed, with much apparent simplicity, infirmities of mind. He said, he "did not know how far one hundred yards, or two hundred yards, were exactly; that he could not step off one hundred yards and count it; that he would forget how far he had gone before he counted a hundred; that his memory was weak and bad; that when he was excited, his mind became confused, and seemed to go out from him; that when a white man spoke to him short, he seemed to lose his mind; that he was excited and scared that morning, when Mr. Allen took him in the collar; that he trembled all over, and had never got over it, and was still frightened from it," &c. This was about two years after the events which had so excited him. Defendant then asked the witness, "if he did not swear on the trial in Choctaw county, before Judge Warren, in the matter of the application for bail by Brad Allen, that he was 'weak-witted." The State objected to the question; the objection was sustained, and the defendant excepted. The defendant then asked the same question, and stated that his object, in asking the question a second time, was to test the recollection of the witness. The State objected, and the objection was sustained again, and the defendant excepted. "The defendant then asked, if he did not believe that some people eat little white roots for certain purposes. The State objected to the question. The defendant stated to the court that the object . . was to show the mental capacity of the witness—that witness entertained singular opinions, and

[Allen v. The State.]

one of them, by eating certain white roots, that gave them peculiar powers." The objection to the question was sustained, and defendant excepted.

The general mental capacity of the witness seems to have been pretty well disclosed, by his answers to questions previously put; and the interrogatory about superstitious notions associated with certain white roots, whether derived from tradition, or the invention of his own fancy, was too remote from the subject to be allowed.—*Blakey's Heirs v. Blakey's Adm'r*, 33 Ala. 611. Besides, such notions need not hinder him from being a good observer of facts, and faithful in narrating them. But, the question about what he said on a preliminary examination about the same matter, some months before, *when put to test his memory*, appears to me admissible. True, he had already testified, in reply to interrogatories, that his memory was weak. But his answers make the impression that he was rather "weak-witted," than of defective memory. He can not be regarded as a good witness, or an expert, in respect to his own mental condition. He evidently had but little of that power of analysis, which enables one to ascertain the nature of peculiar defects. His testimony, touching several matters, differed from that of some of the other negro witnesses, but was apparently given in a manner to inspire confidence in its truthfulness. Therefore, it might be important to show, by such a test as that proposed, that the memory of the witness was not to be trusted; that he was speaking of things that existed only in his imagination. But my brothers think the matter inquired about was not relevant enough, and that the ruling of the circuit judge should not be reversed.

3. We do not find any evidence of *confessions* in the record. What are referred to as such, are but explanations, made by defendant, immediately after the homicide, to the laborers in his employment, and were proved, without objection, as a part of the *res gestæ*.

4. There was no error in the charges given that were excepted to by defendant, nor in the refusal of the court to give the last two of the charges asked in his behalf. The duty of the jury to accord to him the benefit of the "reasonable doubt," was amply impressed, in many forms, upon them. And as to the two charges for defendant, which were refused, the first was calculated to lead the jury off, upon an inquiry concerning what other persons than defendant might have thought of the danger of his situation, and was otherwise objectionable; while the last charge refused spoke of an apprehension of imminent danger to defendant, without specifying the nature of the danger, whether to life, of great

[Mitchell v. The State.]

bodily harm, or some other, to which it is suggested he might have been exposed. In fact, however, there was no evidence of any such danger at all, as to justify the giving of any charge on that subject.

Let the judgment be affirmed.