## Jones *v.* The State.

### *Indictment for Murder.*

1. *Threats by defendant; admissibility of.*—In a prosecution for murder, the defendant's threat, or declaration—"*Damn him, I am going to kill him*"—not naming any particular person, is admissible as evidence against him, when it is shown that it was made on the day of the killing, and that a few hours previously he had had an altercation with the deceased; and it is for the jury to determine whether the threat had reference to the deceased.

2. *Impeaching witness by proof of difficulty with party.*—The testimony of a witness may be discredited, by showing that he has expressed or evinced a feeling of partiality or bias in favor of the party by whom he is introduced, or of animosity towards his adversary; and this may be shown, as to a witness for the defense in a prosecution for murder, by proof of an altercation between him and the deceased on the day of the killing, and the character of that difficulty as serious or trivial; but only

[Jones v. The State.]

the fact of the difficulty is admissible evidence, and the merits or particulars thereof can not be inquired into.

3. *Proof of character.*—Whenever character is properly in issue, it must be proved by general reputation, and evidence of particular acts or conduct is not admissible.

4. *Self-defense.*—When a man is attacked in his own dwelling, he is not required to retreat from it, in order to invoke the benefit of the doctrine of self-defense, and his place of business is deemed, *pro hac vice,* his dwelling; and this principle applies as between partners, joint tenants, and tenants in common.

5. *Larceny or trespass, as between partners, and as excuse for killing.* The defendant and the deceased being partners, or joint owners of a barroom, its contents and proceeds, the taking of money from the drawer by the deceased would be neither a larceny nor a trespass, nor, of itself, would it reduce the killing from murder to manslaughter.

6. *Self-defense.*—To establish the plea of self-defense in a case of homicide, the defendant must have entertained at the time an honest belief in the existence of a present necessity on his part to kill, in order to save his own life, or to prevent the infliction of grievous bodily harm; and the circumstances must have been such as to impress the mind of a reasonable man, under the same state of facts, with a belief of such imminent peril and urgent necessity.

From the Circuit Court of Russell.

Tried before the Hon. Jas. E. Cobb.

The defendant in this case, Thomas D. Jones, was indicted for the murder of Ivey Doles, by shooting him with a pistol; was tried on issue joined on the plea of not guilty, convicted of murder in the second degree, and sentenced to the penitentiary for the term of eighteen years. A bill of exceptions reserved on the trial purports to set out "substantially all the evidence bearing on the charges refused," and shows these facts: The defendant and the deceased were brothers-in-law, having married sisters, and they were joint owners and proprietors of a bar-room in the town of Seale, in said county; "of which," it is stated, "the deceased had immediate charge at the time of the killing, but the precise interest therein of each was not proved." The killing occurred in the bar-room, about dark, on the evening of April 10th, 1883; the only persons present in the room at the time, besides the parties themselves, being H. B. Ferrell, the sheriff of the county, and George Ferrell, his brother, who was also his deputy; and said H. B. and George Ferrell were examined as witnesses on the part of the defendant. Several other persons were at the time sitting on a bench at the door of the bar-room, who were prevented by a screen from seeing what occurred inside of the room. One of these persons, Miller by name, who was introduced as a witness on the part of the prosecution, testified that he went into the bar-room, "about an hour and a half by sun in the evening of that day," and found the deceased behind the counter, and, on going into a back room, where a pool-table was kept, they found the defendant lying asleep on a bench; that H. B.

Ferrell, the sheriff, came into the room a few minutes afterwards, and laid down on the counter to sleep, the deceased giving him something to put under his head ; that the defendant fell off the bench while witness and the deceased were playing pool, but was not awakened by the fall, and was put up on the bench again by them ; that, while lifting him, they discovered a pistol in his pocket, which the deceased took from him, and put it somewhere behind the counter ; that he (witness) walked out of the room when the game of pool was finished, and sat down on the bench outside of the door ; that he " heard loud talking in the bar-room, shortly before the shooting, but could not understand what was said, the report of the pistol being the first noise that attracted his attention." One Hammond, another one of the persons sitting on the bench, testified that he " heard loud talking in the bar-room, and saw defendant walking backwards and forwards in front of the counter ; did not know who was talking until he heard the deceased say, ' *You d—d son of a b—, you are the cause of all this dispute ;*' heard defendant say, ' *Do you call me a d—d son of a b—?* ' ; heard talking still, and heard ' scrimmage,' near to, behind, and against the counter, as if some one was ' grabbing the counter,' and at the same time heard the shooting." When these witnesses entered the room, the sheriff was lifting up the body of the deceased, who had fallen behind the counter, and was dead, being shot in the forehead above the left eye. His face was blackened with powder, " from the end of the nose downward, but not upward." No weapon was found on his body "except an ordinary pocketknife, which was found protruding half way out of his right pocket, and was shut." His hat was lying on the floor near his body, and was perforated with a bullet-hole corresponding with that in his forehead ; and two silver dollars were found in or near his hat, and a half-dollar on the floor. The bill of exceptions states that " the powder-burns, the hat and the silver coins were introduced by the State, to show the attitude of the deceased at the time he was shot, and to support the State's theory, that the deceased was standing near the money-drawer when he was shot, looking down into it, and taking money therefrom."

The State proved, also, " that the defendant applied to one Collier, about nine or ten o'clock in the morning on the day of the killing, for the loan of a pistol, but did not get it ; and that he tried to get a gun at Johnson's store, during the evening of that day, but did not get one. The State also introduced Reese and Murrell, who testified that, about four o'clock in the afternoon of the day of the killing, they saw the defendant, H. B. Ferrell and George Ferrell in Johnson's bar-room ; that the defendant appeared to be drunk, and Johnson took him by the

[Jones v. The State.]

arm, and led him into the back room ; that, after they had entered the back room, they (witnesses) heard defendant say, ' *Damn him, I am going to kill him*,' but he did not mention any name." The defendant objected to the admission of this evidence, and duly excepted to the overruling of his objection. The bill of exceptions states in this connection, " There was no evidence showing, or tending to show, any difficulty between the defendant and any one except the deceased."

" The State introduced one William Starke as a witness, who testified that, as he was passing said bar-room on his way from supper, Jones (defendant) called him in, and asked him the question, '*Are you my friend?*' to which he made no reply ; that Jones, when witness went in, was standing in front of the bar counter, while Doles (deceased) was behind the counter, near the water-tank on the counter, and Sheriff Ferrell was also behind the counter, near Doles ; that said Ferrell and Doles were talking about a lawsuit, and witness understood Ferrell to say, ' *You are a G— d— rascal ;*' that he (witness) then went out, and in a very few minutes heard a pistol fire. To this conversation between said Ferrell and Doles, which is a part of the conversation afterwards testified to by said Ferrell, a witness for defendant, the defendant excepted, and moved the court to exclude it from the jury ; but the court permitted the conversation to go to the jury, and the defendant excepted." Another witness for the State testified that, " as he passed the bar-room, about ten or fifteen minutes before the shooting, he heard said Ferrell and the deceased quarrelling about some rent money ; that Doles seemed to be mad and excited, and Ferrell cool and in good nature." No exception was reserved to any part of this testimony. " The State proved, also, that the defendant could have protected himself from danger, by stepping behind the screan, or into the pool-room ; and that, if he was standing midway between them, about two steps in the direction of either would have placed him under cover, and out of danger, without leaving the house."

Sheriff Ferrell, being introduced as a witness for the defense, testified that the pistol used by defendant belonged to him, and was lent by him, about ten o'clock in the morning of that day, to defendant, who said he wanted to go to Society Hill ; that the defendant also asked him for a gun some time during the afternoon, "as he wanted to go out to Cooksey's pond a fishing, and witness told him the gun was at Johnson's bar." As to the occurrences in the bar-room just before and at the time of the shooting, he testified, that he was awakened about dark by his brother George, who told him it was time to go to supper ; that he then awakened the defendant, and asked for his pistol ; that the defendant felt about his person for the pistol, and

asked Doles if he had taken it ; and that Doles replied, he did not know anything about it.   "About this time," as the bill of exceptions then continues, " Doles told witness he wanted to see him about a matter before he left ; and witness then left Jones, and went to where Doles was standing behind the counter, near the water-tank.   Doles then said, that he had applied to the probate judge for some money on an order of the Commissioners Court, and was informed by him that witness had instructed him not to pay the money to him (Doles), but to keep it on the rent of a house.   Witness explained, that he was security for Doles for the rent of the house in which Doles and Jones lived, and had told the probate judge, if he could do so consistently, to hold the money due Doles on the order for rent. Doles said, ' *All right, Ben.*'   Witness then said to Doles, as long as they were explaining, he had something to say in a clever way ; that he had heard Doles had employed Col. S. [an attorney] to sue him for a settlement of their accounts while Doles was acting as deputy-sheriff under witness.   Doles replied, ' *Whoever says that, tells a damned lie.*'   Witness then told Doles, that he knew it could not be so, as he (Doles) knew that he owed witness at least $215 on a settlement ; and witness might have said, ' *Any body who would sue me under the circumstances, would act the damned rascal.*'   (This is the conversation testified to by said Starke, as stated above.)   Just about this time, Doles turned to Jones, who was standing or walking in front of the counter, and said, ' *You are a damned thief ;*' and then stepped up near the money-drawer, and took the pistol out from under a muslin cover that hung over the lower shelf, and, placing the muzzle near his forehead, said, ' *Here, take the pistol, and shoot me ;*' and then shoved the pistol across the counter, in the direction of Jones, butt end foremost.   Jones caught the pistol, and held it in his hand, with his arm hanging down by his side.   Doles then returned to where witness was standing, and they passed a few words in a friendly way, when Doles, passing witness, went around through the pool-room, into the bar-room, in front of the counter, in a threatening manner, and said to Jones, ' *G— d— you, I can clean you.*' Jones stepped back one or two steps, but made no motion to shoot or strike Doles.   Witness then took hold of Doles, and told him he ought not to strike Jones, as they were brothers-in-law ; and witness and Doles then went back through the pool-room, behind the counter, near the water-tank.   As they were going back, Doles asked witness to take a drink, which he declined, but said he would take a cigar in stead.   They went behind the counter together, when Doles took down a box of cigars, and handed them to witness, who took one, and was putting it in his vest pocket, saying he would not smoke until

after supper, when Doles said to Jones, ' *You d— s— of a b—, I'll fix you ;*' and at the same time reached over the counter, with his left arm extended, his hand open, slightly shaking his hand ; his body leaning forward on the counter, and throwing his right hand to his right hip pocket. Witness saw something *shiny* in his hand, which he took to be a pistol or knife. Just as Doles was leaning over the counter as described, Jones fired, when Doles threw up his hands and fell." George Ferrell, the brother of H. B. Ferrell, testified as to these matters substantially as above stated.

Several witnesses for the defendant testified to the character of the deceased as a turbulent and dangerous man ; though some of them " gave him that character only when drinking, and several witnesses for the State testified that he was ordinarily quiet and peaceable. Several witnesses for defendant proved his good character. Defendant offered to prove particulars in reference to his character ; to which the State objected, and the court sustained the objection ; to which defendant excepted."

The defendant requested, in writing, fifteen charges, of which the following were refused, exceptions being duly reserved to their refusal :

" 1. Whilst the law requires, under some circumstances, that a person assailed shall avail himself of all reasonable means of escape from the danger, before he is excused for taking the life of his assailant ; yet it is never required that he shall leave his home, or his place of business, to escape such danger.

" 2. If the jury believe that the defendant, at the time of the killing, was in the building where he was doing business, and which was occupied by him as his place of business ; and that he was there assailed by the deceased, under such circumstances as to reasonably impress him with the belief that his assailant intended to inflict on him great bodily harm, and that there was imminent danger that such injury would be inflicted upon him ; then the defendant had the right to repel such assault by shooting the deceased, and he must be acquitted, provided he did nothing to provoke the assault.

" 3. If the jury believe, from the evidence, that the defendant and the deceased were in close' proximity to each other at the time of the killing ; and that the defendant did nothing to bring on a difficulty, or to provoke an assault on himself by the deceased ; and that the deceased assumed a hostile attitude, and placed his hand upon, or in the direction of his pistol pocket, in such a manner as to indicate to a reasonable mind that he intended to draw and fire ; then the defendant had a right to fire first, whether Doles was armed or not.

" 4. If the jury believe, from the evidence, that the defend

ant had no formed design to take the life of the deceased, and had no malice towards the deceased, but shot him on sudden impulse and passion, when he saw the deceased taking the money, then the defendant is not guilty of murder, though he may be guilty of manslaughter.

" 5. In considering the guilt or innocence of the defendant, the jury can not consider the condition of the finances of the county, in report of the grand jury at the present term of the court, or the actions of the juries in the trial of other causes."

W. F. FOSTER, for the appellant.—(1.) There was no connection whatever between the declaration, or threat, said to have been made by the defendant at Johnson's bar-room, and the subsequent difficulty with Doles; and the evidence in relation to it ought to have been excluded.—*Rogers v. The State*, 62 Ala. 170 ; *Redd v. The State*, 68 Ala. 492. (2.) Nor was there any connection between the conversation between Doles and Ferrell and the subsequent difficulty between Doles and the defendant ; and although the defendant afterwards examined Ferrell as to the particulars of this conversation, the error in the admission of the evidence was not thereby cured. *Mitchell v. The State*, 60 Ala. 26 ; *Rogers v. The State*, 62 Ala. 170 ; *Redd v. The State*, 68 Ala. 492. (3.) The doctrine of self-defense, as applicable to the facts of this case, is correctly asserted in the charges asked and refused.—*Roberts v. The State*, 68 Ala. 156 ; *DeArman v. The State*, 71 Ala. 351. (4.) The correctness of the 4th charge asked and refused is sustained by 2 Bish. Crim. Law, 706, notes, and authorities there cited. (5.) The principle asserted in the 5th charge can not be questioned. The jury ought always to be cautioned against extraneous influences. The charge can not be considered abstract, since the matters referred to were facts which occurred in the presence of the court.

T. N. McCLELLAN, Attorney-General, for the State, cited the following cases : (1.) As to the admissibility of the evidence objected to : *Ford v. The State*, 71 Ala. 385 ; *Ross v. The State*, 62 Ala. 224. (2.) As to the charges asked and refused : *Carroll v. The State*, 25 Ala. 35 ; *Storey v. The State*, 71 Ala. 337 ; *Pond v. The State*, 8 Mich. 150 ; 1 Hale's P. C. 482–3 ; Whart. Hom. 541 ; *Wills v. The State*, 73 Ala. 362 ; *Bain v. The State*, 70 Ala. 4 ; *Oliver v. The State*. 17 Ala. 587 ; *Judge v. The State*, 58 Ala. 406 ; *Nutt v. The State*, 63 Ala. 180.

SOMERVILLE, J.—The threat made by the defendant against some one not designated or identified by him—in which he declared, in general terms, " Damn him, I am going to kill

him"—was clearly admissible in evidence, under the authority of *Ford v. The State,* 71 Ala. 385, 396. This threat was made but a few hours before the killing of the deceased by defendant, and after the parties had engaged in a previous altercation on the same day. It was a matter of mere inference for the jury, whether the threat had reference to the deceased or to some other person.

It was competent to prove that the sheriff, Ferrell, had engaged in an altercation with Doles, the deceased, a short time prior to the killing, for the purpose of impeaching Ferrell's testimony, he being a witness in the cause for the defendant. The order of the introduction of this evidence was immaterial. The fact of such difficulty could be shown, and the gravity of its nature, or the contrary ; but its merits, or details, could not be proved, nor any particulars tending to show who was in fault. The purpose is to prove such a bad state of feeling towards the deceased, as would tend to bias the testimony of the witness. *McAnally v. The State,* 74 Ala. 9. It is a common mode of discrediting a witness for the prosecution, to ask him, on cross-examination, whether he has not expressed feelings of animosity or revenge towards the prisoner ; and so, of a witness for the prisoner, whether he has not previously evinced a feeling of partiality or friendliness for him. —1 Greenl. Ev. (14th Ed.) § 450, note *b* ; 2 Best Ev. § 644. There is no reason why the fact indicating such bias may not ·be as well proved in any other legal way, because it is the fact, and not its mode of proof, which goes to the root of the witness' credibility. Whart. Cr. Ev. §§ 485, 477 ; 1 Whart. Ev. §§ 544, 561. The State should have confined the testimony of the witness Starke to the fact and time of Ferrell's altercation with the deceased, and the language of denunciation used which indicated the nature of his animosity, and disclosed the strength and degree of his prejudices in the main transaction under process of judicial investigation.

While evidence is always admissible to show, generally, whether the character of a person is good or bad—when the question of character is properly put in issue—it is not competent to establish one's reputation or character by introducing evidence of particular acts, or of specified conduct on his part. The testimony must be confined to reputation, which has been justly said to be " the only mode in which character can be exhibited to us."—Whart. Cr. Ev. §§ 259–60 ; 1 Greenl. Ev. § 55. This rule does not conflict with the principle settled in *DeArman v. The State,* 71 Ala. 352, where it was held that a witness, who had testified on direct examination to the general good character of a defendant, could, on cross-examination, be asked whether he had not heard of certain enumerated acts of

defendant which tended to show that his character was not good.

It is an admitted doctrine of our criminal jurisprudence, that when a person is attacked in his own house, he is not required to retreat further. The reason of the rule is said to be, that the law regards a man's house as his castle, or, as was anciently said, his *tutissimum refugium*, and having retired thus far, he is not compelled to yield further to his assailing antagonist.—1 Hale's P. C. 486 ; *Storey v. The State*, 71 Ala. 385 ; *Carroll v. The State*, 23 Ala. 28 ; *State v. Patterson*, 12 Amer. Rep. 212, NOTE ; *State v. Harman*, 78 N. C. 515. When he has reached this refuge, he may stand at bay, and " may turn on and kill his assailant, if this be apparently necessary to save his own life ; nor is he bound to escape from his house, in order to avoid his assailant." An assailed person, as said by Mr. Wharton, " is not bound to retreat out of his house to avoid violence, even though a retreat may be safely made."—Whart. on Homicide, § 541. This is admitted to be the settled rule, as between one who is the exclusive owner of the house, and an aggressor who has no right of entrance ; but its application is denied, as between joint owners or possessors, or tenants in common with equal rights of possession. We have found no authority for this distinction, and we can not perceive any solid basis of reason by which it can be supported. Why, it may be inquired, should one retreat from his own house, when assailed by a partner or co-tenant, any more than when assailed by a stranger who is lawfully upon the premises ? Whither shall he flee, and how far, and when may he be permitted to return ? He has a lawful right to be and remain there, and the legal nature and value of this right is not abrogated by its enjoyment in connection with another. The law only exacts of each that he shall enjoy his property and possession so as not to injure the other. It is our opinion that the doctrine of retreat, or of declining combat by retreat, has no application to cases of this character, and that the right of self-defense may be perfect without it, where one partner or co-tenant is assailed by another, each being equally entitled to possession of the house or premises where the attack is made.

Nor, in our judgment, is there any doubt about the fact that a man's place of business must be regarded, *pro hac vice*, his dwelling ; that he has the same right to defend it against intrusion, that he has to defend his dwelling ; and that he is no more under the necessity of retreating from the one than the other when he is unlawfully or feloniously assailed, being lawfully in its occupancy.—*Morgan v. Durfee*, 69 Misso. 469.

The first and second charges requested by the defendant

[Jones v. The State.]

should, in view of this principle, have been given, and their refusal was error.

The fourth charge requested by the defendant was erroneous, in assuming that the taking of the money by the deceased was a provocation sufficient to extenuate the killing to . manslaughter. The deceased had the interest of a partner in the bar-room and its proceeds,—certainly of a tenant in common,—being in possession, and with equal rights as against the defendant. He committed no larceny, or even trespass, in taking the money ; and even had this been the case, there would have been no provocation adequate to reduce the homicide from murder to manslaughter, provided the other facts of the case were sufficient to constitute the act of killing murder on the part of the prisoner.—*Storey's Case, supra* ; 1 Bish. Cr. L. (7th Ed.) §§ 849, *et seq.* ; Clark's Man. Cr. L. §§ 435, *et seq.*

The apparent necessity which will excuse the taking of human life under the doctrine of self-defense, in cases of homicide, involves two considerations : 1st, the defendant himself must have entertained an honest belief in the existence of such necessity ; and, 2d, the circumstances surrounding him must have been such as to impress a reasonable man, under the same state of facts, with the belief of his imminent peril, and of the existence of an urgent necessity to take the life of his assailant, as the only apparent alternative of saving his own life, or else of preventing the infliction of grievous bodily harm.—*Storey v. The State,* 71 Ala. 337, and cases cited ; Whart. on Hom. §§ 517–520. The third charge requested by the defendant was properly refused, because it entirely ignored all consideration of the defendant's honest belief in the existence of a necessity which excused the commission of the alleged homicide.—*Allen v. The State,* 60 Ala. 19.

We see no error in the refusal of the last charge requested by defendant, and numbered five. It was abstract, being entirely unsupported by the evidence, and otherwise objectionable.

For the error of the court in refusing to give the first and second charges requested, the judgment of conviction is reversed, and the cause remanded for a new trial. In the meanwhile, the defendant will be retained in custody, until discharged by due course of law.