# Hussey *v.* The State.

## Indictment for Murder.

| | |
|---|---|
| 87 | 121 |
| 98 | 29 |
| 98 | 48 |
| 98 | 65 |
| 87 | 121 |
| 99 | 181 |
| 87 | 121 |
| 102 | 98 |
| 87 | 121 |
| 125 | 448 |
| 87 | 121 |
| 128 | 60 |
| 87 | 121 |
| 133 | 27 |
| 133 | 60 |
| 133 | 71 |
| 87 | 121 |
| 139 | 65 |

1. *Change of venue.*—In a criminal case, a change of venue is a matter of right, if the application is made in due time, and is supported by sufficient evidence (Code, § 4485); but it is properly refused, when, on all the evidence adduced for and against the application, the court is not reasonably satisfied that an impartial trial and an unbiased verdict could not reasonably be expected in the county in which the indictment was found.

2. *Same; counter affidavits.*—By the established practice in this and other States, on application for a change of venue, counter affidavits may be received against those offered in support of it; and this practice is not violative of the constitutional principle which gives to the accused the right to be "confronted by the witnesses against him."

3. *Dying declarations.*—The declarations of the deceased in this case, made to different persons, at intervals, during the three days he lived after receiving the fatal wound, always expressing the belief that he would die from the effects of the wound, were properly admitted as evidence, although some of his friends declared to him their belief that he was not seriously wounded, and one of his attending physicians had expressed to him the hope that he might recover.

4. *Proof of character.*—A witness, testifying to the character of the

[Hussey v. The State.]

defendant as a peaceable and quiet man, may be asked whether he "ever heard of his having any other difficulty than the one in question," and may testify that he had not.

*Objection to question and answer.*—When a question is in proper form, and calls for evidence which is *prima facie* relevant and legal, the refusal to allow it is a reversible error, although the proposed or expected answer of the witness is not stated.

5. *Proof of character.*—Evidence of character, at least on direct examination, goes to general reputation only, and can not be extended to particular acts, or specified conduct; nor can a witness give his own opinion as to the person inquired about;—as, that he was a "model man," or "was a timid man, and would rather avoid than provoke a difficulty."

6. *Same; cross-examination of witness; impeaching.*—Witnesses for the prosecution having testified to the good reputation of the deceased as a peaceable and quiet man, and having denied, on cross-examination, that they had ever heard of certain specified personal difficulties in which he was said to have been involved; the defendant can not prove the existence and general notoriety of these difficulties, for the purpose of discrediting their testimony.

7. *Character of deceased; evidence as to.*—On a trial for murder, the prosecution may adduce evidence of the character of the deceased as a peaceable and quiet man, although the defense has only proved particular traits of his character, as a quick-tempered, violent man, easily provoked, and likely to provoke a difficulty.

8. *Charge as to effect of evidence of good character.*—The court may properly instruct the jury in a criminal case, that proof of good character is not permitted to go to them for the purpose of shielding the defendant from the consequences of his conduct, but simply as a circumstance to be considered by them with the other evidence in the case; that if, from all the evidence, they believe the defendant guilty beyond a reasonable doubt, they should say so as firmly against a man of good character as bad; that good character does not shield from the consequences of a criminal act, proved to the satisfaction of the jury beyond a reasonable doubt, though it may raise a reasonable doubt that the act was done with the criminal intent.

9. *Testimony of physician as expert; hearsay.*—A practicing physician, who examined the deceased after he was wounded, and has given his own diagnosis of the case, can not be allowed to testify that other physicians concurred with him in opinion.

10. *Wife as witness for husband.*—In a criminal case, the wife is not a competent witness for her husband.

FROM the Circuit Court of Madison.

Tried before the Hon. H. C. SPEAKE.

The bill of exceptions in this case purports to set out "all the material evidence," and the opinion of this court states the facts bearing on each point decided. The defendant reserved an exception "to so much of the general charge of the court as follows," the charge being given in writing: "All men, whether of good or bad character, are liable to punishment, and should receive punishment when they violate the laws of the land. Proof of good character, then, is not permitted to go to the jury for the purpose of shielding the defendant from the consequences of his conduct, but

[Hussey v. The State.]

simply as a circumstance to be considered by the jury with the other evidence in the case; and if, from all the evidence in the case, the jury believe the defendant to be guilty beyond a reasonable doubt, they should say so by their verdict, as firmly against a man of good character as of bad. Good character does not shield from the consequences of a criminal act, proved to the satisfaction of a jury beyond a reasonable doubt, though it may raise a reasonable doubt of the act having been done with the criminal intent."

R. A. McCLELLAN, MILTON HUMES, and R. C. BRICKELL, for appellant.—(1.) The orders for a special *venire*, including the jurors *drawn*, instead of those *in attendance*, were erroneous.—*Goley v. State*, 85 Ala. 333; *Jackson v. State*, 77 Ala. 18; *Posey v. State*, 73 Ala. 490; 55 Ala. 61. The order for the special *venire* at the February term, 1889, when the trial was had, was also erroneous.—Code, § 4449; cases *supra*. (2.) The challenge to the array ought to have been allowed.—61 Ala. 169; 47 Ala. 726; 5 So. Car. 429; Th. & M. on Juries, 132, 144. That the challenge to the array was part of the record, see Proffatt, 153; 1 Denio, 281, 308; 4 Wend. 229, 239; 21 Wend. 509, 445; 6 Cowen, 555. (3.) One of the special jurors being also one of the regular jurors for the week, the list served was one less than the number ordered; and this was an error.—68 Ala. 515. If one name may be duplicated, why not twelve or more? (4.) The application for a change of venue ought to have been granted.—*Seams v. State*, 84 Ala. 410; 47 Ala. 68; 45 Ala. 32. That counter affidavits ought not to have been received, see 1 Bish. Crim. Pro., 72; 28 Ala. 28, 38. (5.) The dying declarations ought not to have been received. 78 Ala. 441, 471; 74 Ala. 1; 68 Ala. 502; 55 Ala. 39; 52 Ala. 192. (6.) The court erred in excluding the proposed evidence of character.—Whart. Cr. Ev. 57; 11 Ohio St. 114; 22 Minn. 407; 67 Ala. 67; 71 Ala. 351; 77 Ala. 18; 55 Ala. 28; 13 Ala. 718; 22 Ala. 23; 28 Ala 53; 58 Iowa, 208; 68 Ind. 238; 51 Texas, 65; 33 Gratt. 413; 10 Cox, C. C. 25; 69 Eng. C. L. 877.

WM. L. MARTIN, Attorney-General, and D. D. SHELBY, *contra.*—(1.) The application for a change of venue came too late.—*Fallin v. State*, 86 Ala. 13; *Shackelford v. State*, 79 Ala. 26; 3 Amer. & Eng. Ency. 102–05; 72 Ill. 95; 75 Ill. 198; 71 Ill. 250. It was properly denied on its

merits.—*Kelly v. State*, 52 Ala. 367; *Seams v. State*, 84 Ala. 410. Counter affidavits were properly received.—*Edwards v. State*, 49 Ala. 334; *Chase v. State*, 43 Ala. 303; *Birdsong v. State*, 47 Ala. 68; 84 Ala. 410. (2.) As to *venire*, motion to vacate service, and construction of jury law, see Code, § 4449; *Goley v. State*, 85 Ala. 333. The failure of the clerk to sign the *venire* was immaterial.—Th. & M. on Juries, §§ 70, 77; 14 Ga. 43; *People v. Williams*, 24 Mich. 156; *Brown v. State*, 74 Ala. 483; *Spicer v. State*, 69 Ala. 161; *Paris v. State*, 36 Ala. 232; *Rash v. State*, 61 Ala. 90. Besides, the question can not be first raised after verdict. Th. & M. on Juries, § 76; Proff. Juries, 143; *Brister v. State*, 26 Ala. 107; 2 Brick. Digest, 166, § 62. (3.) The dying declarations were properly received.—6 Amer. & Eng. Encyc. Law, 127, 122; *Ward v. State*, 78 Ala. 441; *Kilgore v. State*, 74 Ala. 7; Whart. Cr. Ev., 9th ed., §§ 282-4; Whart. Hom., § 756. It is immaterial at what time the predicate is proved.—*Edwards v. State*, 49 Ala. 334. As to test of credibility, see Whart. Hom., § 756. (4.) Evidence of character confined to proof of general reputation.—*Jones v. State*, 76 Ala. 6; *Davenport v. State*, 85 Ala. 338; Whart. Cr. Ev., 9th ed., 58; *Reg. v. Rawton*, L. & C. Cr. Cases, 520; *DeArman v. State*, 71 Ala. 351. The refusal to allow a question, when the record shows character was fully proved, will not work a reversal.—11 Ohio St. 114; 37 Penn. 108. (5.) As to competency of jurors, see *Bales v. State*, 63 Ala. 30; *Carson v. State*, 50 Ala. 134; *Pearson v. State*, 72 Ala. 191. (6.) As to charge on character, see *Armor v. State*, 63 Ala. 173; 5 Cush. 334; 74 Ala. 1.

SOMERVILLE, J.—The prisoner in this case was tried for the murder of Matt. Strong, and, being convicted of murder in the second degree, was sentenced to confinement in the penitentiary for a period of twenty-five years. The questions presented have been ably and exhaustively argued, both at the bar and in the written briefs of counsel.

1. A careful examination, by each of the judges, of the application made by the prisoner for a change of venue in this case, including the affidavits both in support of the motion, and those offered in opposition to it, has led us unanimously to the conclusion that it was properly overruled. The evidence fails to show to our reasonable satisfaction that an impartial trial and an unbiased verdict could not reasonably be expected, according to the ordinary course of justice, in

the county of Madison where the indictment was found. Regarding the application as having been made in due time, which we need not decide, it will be overruled on the authority of the rule declared in *Seams v. The State*, 84 Ala. 410.

2.　In determining the merits of this application, we have considered the counter affidavits offered by the State, to the introduction of which the record shows objection was duly taken in the court below. It is our opinion that the exception based on the admission of these affidavits was properly overruled. The reasons urged in argument against this evidence are two-fold: *First*, it is said to be in violation of section 7 of Article I of our State constitution, which provides that, "in all criminal prosecutions," the accused shall have the right "to be confronted by the witnesses against him"; and, *secondly*, that such evidence is *ex parte*, and of an unreliable nature, the deponents not being subject to cross-examination, and there being no compulsory method of forcing them to swear to affidavits.

The objection urged against the value, or weight of such evidence, is unquestionably well taken, and is suggestive of admitted elements of weakness in this kind of testimony. It goes, however, to the question of its sufficiency, rather than that of its competency; and it applies to every class of cases where *ex-parte* affidavits are held to be admissible, whether civil or criminal, or in courts of law or equity, which are numerous. It has always been said that this species of evidence is of a very low order, and that it ought to be received with caution and closely scrutinized; and the propriety of its reception in many instances is, for this reason, addressed to the sound discretion of the lower court. On principles of necessity and convenience, it has long been received by courts of equity, upon applications for the appointment or discharge of receivers, and various other interlocutory motions; by courts of law, to grant new trials, enter satisfaction of judgments, obtain attachments, and the like; and in criminal proceedings, for leave to file an information, to mitigate or aggravate punishment after convictions of misdemeanor, to discharge from wrongful arrests; and in applications for discharge in *habeas corpus* cases. The same practice is authorized, and has long prevailed in this and other States, in motions made for changes of venue in both criminal and civil cases. From the earliest period of our State's history, *ex-parte* affidavits have been received on the part of both the defendant and the State, in applications of this character. The com-

petency of such testimony, whatever may be its value, is well established by uniform practice, as well as by authority. 1 Bishop Cr. Proc. (3d Ed.), § 73; *Seams' case, supra; Ex parte Chase*, 43 Ala. 303; *Birdsong's case*, 47 Ala. 68; *Edwards' case*, 49 Ala. 334.

The supposed constitutional objection can not be sustained to such counter affidavits when offered by the State. It is only in "criminal prosecutions" that the right of the accused to be confronted by his witnesses is secured. This has reference only to the trial proper—or those proceedings which follow between the commencement of the trial and the verdict of acquittal or conviction. It manifestly has never been supposed to extend to the preliminary proceedings in the grand jury room, upon which the indictment is founded, or other collateral proceedings. It is akin to the right to be heard by counsel, to demand the nature and cause of the accusation, to have compulsory process for witnesses, to be exempt from giving evidence against oneself, and to have a speedy trial by an impartial jury; which are guaranties enumerated in the same clause of the constitution, and must be interpreted by the principle of *noscitur a sociis*.—Const. 1875, Art. I, § 7. All these are rights secured during the trial of the defendant—not on the investigation of issues collateral, or preliminary to his prosecution.

This construction was long ago placed by the United States Supreme Court on the analogous clause of the Federal constitution, which declares that, "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Ex parte Bollman*, 4 Cranch (U. S.), 75, which was an application for *habeas corpus*, the question arose, whether an *ex-parte* affidavit, made before a magistrate to obtain a warrant of arrest, could be used as evidence on a motion to commit, and whether the accused was not entitled to demand *viva voce* evidence rendered in his presence. The affidavit was held admissible, on the ground that the preliminary investigation, instituted to determine whether the accused should be discharged or held to trial, was not, strictly speaking, "a prosecution," within the meaning of this clause of the constitution. The same question was raised shortly afterwards in the case of Aaron Burr, before the Circuit Court of the United States at Richmond, which was an application for discharge on *habeas corpus*. Chief-Justice MARSHALL held, that an *ex-parte* affidavit was admissible on the same ground stated in the other

[Hussey v. The State.]

case, such evidence not being, in a case of that nature, objectionable on constitutional grounds.—Burr's Tr. 97. This view of the constitution has not been seriously questioned since that time in this country—the word prosecution being generally conceded to embrace only the trial proper of a criminal cause, and not collateral motions merely incidental to the cause.—Hurd on *Habeas Corpus*, §§ 207–220; 5 Cr. Law Mag. (1884), p. 798, and cases cited in note 2; 1 Bish. Cr. Proc. (3d Ed.), § 75. The right to change the venue, it may be added, is a statutory, not a constitutional right of the citizen. It may therefore be given or taken away *ad libitum* by legislative enactment. This being true, the privilege may be burdened, when given, by such reasonable conditions as the law-making power may elect to attach to it. Had the General Assembly declared that one of the conditions of exercising the right to make such an application should be the admission of affidavits on the part of the State, the condition would be valid, because that to which it is attached is of grace, and not of right. The principle can not vary because the condition is attached by judicial construction, and not by the express words of the statute.

We adhere to the established practice on this subject, which has uniformly authorized the admission in evidence of counter affidavits introduced by the State, in answer to the defendant's evidence of like kind in support of his motion for a change of venue.

3. One of the points most earnestly pressed on our attention in this case is the admission of the dying declarations of the deceased, which were made at different times, to various witnesses, between the time he received the fatal wound, on Wednesday in the forenoon, and the hour of his death, on the afternoon of the following Saturday. The contention is, that no sufficient predicate was laid for the admission of this evidence.

The rules of law on this subject have been too often discussed by this court to justify any additional attempt on our part to restate them at any great length. The difficulty does not lie in the rules themselves, but in the just and proper application of them to the particular facts in each case. The purpose of the court should be to arrive at the state of the declarant's mind when the declarations were made, taking into consideration all that was said by him, and the surrounding circumstances of the case, including the nature of the injury which produced decedent's death, and his probable

appreciation of its fatal character. The inquiry is, were such declarations uttered under the sense of impending dissolution—under the solemnity of the conviction that death was near at hand, and that there was no hope of the declarant's recovery? Was he fully conscious of the fact that he could not rally from the effects of his injury—so that he entertained no expectation of ultimate recovery? If this be true, then what he said under this conviction—this despair of recovery—touching the homicide and its attendant circumstances—which carried with it all the solemnity of a sworn declaration, is admissible, although in point of fact there was no rapid succession of death, and no apprehension of such event immediately following.

The wound in question was inflicted by a pistol shot—the ball being described as conical, and "38 calibre." It passed into the left side of the deceased, and lodged in his back near the surface of the skin, from which it was extracted by the attending physician on the day after the shooting. The physician, Dr. Dement, expressed the opinion that it passed through the lung of deceased, and fractured the rib, producing much suffering from nervous shock. The deceased fell to the ground at the time he was shot, and was never able afterwards to stand, remaining in bed to the hour of his death, which occurred three days afterwards.

All his utterances made on the first day show unmistakably his belief that death was imminent, and that he entertained no hope whatever of recovery. He declared immediately after the occurrence to the witness Patton, whom he requested to help him up from the place he had fallen in the open field, that "he would never get over it." On the same morning, and at the same place, he said to his brother, James Strong, that "he could not get well, and that he would be dead in a few minutes"; and, after requesting not to be put in a vehicle to be carried home, he repeated, that "he knew he could not live." About eleven o'clock on the same day, while in bed at home, he said to the witness Newman Jones, when asked how he felt, that "he was a dead man;" and to the suggestion that he was "more scared than hurt," he replied that he was "worse hurt than the witness thought he was." To his wife, Mrs. Strong, who was with him during his entire confinement, he said "he was bound to die," and that "he was going to die, *every time.*" To Dr. Dement he said "he did not think he could get well"; and this in reply to words of encouragement given him, and, it seems,

[Hussey v. The State.]

in face of the fact that Dr. Mastin, also one of his attending physicians, expressed the hope, in his presence, that he would recover. Every utterance made on the day of the shooting makes it clear to our minds that the deceased did not then entertain the faintest hope of recovery. And while the expressions afterwards used are not so strong, still they show with sufficient clearness that there was no revivor of hope, but a settled conviction in despair of life. On Thursday— the day the ball was extracted—when told by Robert Strong that he hoped he would get well, he persisted in asserting that he did not think he would," and again that "he did not think he could live." The testimony of his brother James Strong, who was with him every day, was "he *always* said he would die."

A careful examination of all the evidence bearing on this subject leads us to the conclusion that, under the principles so often declared by us in adjudged cases heretofore decided, the Circuit Court properly admitted all the dying declarations testified to by the several witnesses, as set out in the bill of exceptions. The predicate laid satisfactorily convinces us that they were made under a sense of impending dissolution, and without the least hope of recovery on the part of the declarant. We could arrive at no other conclusion without in effect overruling many of our reported cases. *Jordan v. State*, 82 Ala. 1; s. c., 81 Ala. 20; *Johnson v. State*, 17 Ala. 618; *Kilgore v. State*, 74 Ala. 7; *Ingram v. State*, 67 Ala. 67; *Ward v. State*, 78 Ala. 441; *Sylvester v. State*, 71 Ala. 17; *Reynolds v. State*, 68 Ala. 502; *Wills v. State*, 74 Ala. 21; Whart. Cr. Ev. (8th Ed.), §§ 282–284; *State v. Johnson*, 9 Cr. Law Mag. (1887) 451, and 453, *note*.

4. The rulings of the court below raise in this case a question of evidence which is of great importance, as it occurs to us, in the practical administration of justice. It involves the right of a defendant to introduce *negative testimony* in support of his good character—a right which does not seem to be recognized by the old text-writers and authorities, but may be said to be accorded from necessity, almost universally, by the *nisi prius* courts in the trial of causes. The defendant was allowed to prove his good character generally for peace and quiet—an issue having reference to the nature of the charge against him, which was murder. Two witnesses were asked the question, whether they had "ever heard of the defendant having any other difficulty except the one in question?" This question was objected to by the

State, and on such objection was excluded. There is good authority in support of this ruling of the Circuit Court, but we are all of one opinion that the question should have been allowed. Bare evidence by a witness that he knows the general character of a given person, and it is good, or very good, or excellent, is, after all, closely analogous to a mere opinion in the nature of a fact, and, standing alone, carries with it an impression that it is lacking in some element to give force to the statement. The party testifying can render it more satisfactory and convincing by showing the foundation on which it rests. It is well to prove a person to be reputed honest, or truthful, or a woman chaste, or a man loyal to his country, or peaceably disposed towards all his neighbors. But great emphasis is added by the declaration that the witness, who has had every opportunity to know, has never heard any human being challenge the honesty or veracity of the one, or breathe the slightest breath of suspicion on the virtue of the other, or assert any fact which goes to deny the loyalty, or question the humanity and orderly conduct of the third. It is only to put the matter in a slightly different form, to inquire of the deposing witness whether he had ever heard of any act or conduct in refutation of the good repute which he has affirmed of the person in question. To say his character is good, is a positive expression of the fact. To say that the witness has never heard any thing *against* his character, as to the particular phase in which it is put in issue, is negative in form, but often more satisfactory than evidence of a positive character.

The propriety of this rule, permitting negative evidence of good character, is gradually forcing itself upon the recognition of the courts, and there is a current of modern authority rapidly forming in support of it.

Mr. Taylor, in his work on Evidence, after observing that the term "character" is not synonymous with "disposition," but simply means reputation, or the general credit which a man has obtained in public opinion, observes as follows of the practice of the English judges on this point: "Aware that 'the best character is generally that which is the least talked about,' they have found it necessary to permit witnesses to give negative evidence on the subject, and to state that 'they have never heard any thing *against* the character of the person on whose behalf they have been called.' Nay, some of the judges," he continues, "have gone so far as to assert that evidence in this negative form is the most cogent

proof of a man's good reputation."—1 Taylor's Ev. § 350. In support of this view he cites the late case of *Reg. v. Cary*, 10 Cox Cr. Cases, 25, where Cockburn, C. J., observes: "I am ready to admit that negative evidence to which I have referred, of a man saying 'I never heard any thing against the character of the person of whose character I come to speak,' should not be excluded. I think, though it is given in a negative form, it is the most cogent evidence of a man's good character and reputation, because a man's character does not get talked about until there is some fault to be found with him. It is the best evidence of his character, that he is not talked about at all. I think the evidence is admissible in that sense."

Mr. Wharton recognizes the same principle, and says : "In view of the fact that the best character is generally that which is least talked about,' the courts have found it necessary to permit witnesses to give negative evidence on the subject, and to state that 'they never heard any thing *against* the character of the person on whose behalf they have been called."—Whart. Cr. Ev. (8th Ed.), § 58; 1 Whart. Law Ev., § 49; and to the same purport is the view of Mr. Bishop. 1 Bish. Cr. Proc. (3d Ed.), § 1117.

A well considered case in direct support of this doctrine is that of *State v. Lee*, 22 Minn. 407; 21 Amer. Rep. 796, where Berry, J., observes: "A very sensible and commendable instance of the relaxation of the old and strict rule is the reception of negative evidence of good character—as, for example, the testimony of a witness who swears that he has been acquainted with the accused for a considerable time, under such circumstances that he would be more or less likely to hear what was said about him, and has never heard any remark about his character—the fact that a person's character is not talked about at all being, on grounds of common experience, excellent evidence that he gives no occasion for censure, or, in other words, that his character is good." It was held accordingly that a witness might, when a proper predicate of knowledge had been laid, be permitted to testify negatively to one's good character by affirming that he had never heard his character discussed, or spoken of by any one.

To the same effect is *Gandolfo v. The State*, 11 Ohio St. Rep. 114, where negative evidence of a defendant's good character was allowed to be given. "Such evidence," it was said, "is often of the strongest description; as, where a character for truth is in issue, that among those acquainted with

the party, it had never been questioned; and so, as to character for peace and quietness, that among those with whom the party associates, no instance has been known or heard of, in which he has been engaged in a quarrel."

In *State v. Nelson*, 68 Iowa, 208, the same rule was recognized, and a witness was allowed to testify that he had never heard anything against the defendant's character or reputation; the court observing that, in the absence of such a rule, "a person, who had so far lived a blameless life as to provoke but little discussion respecting his character would oftentimes be utterly unable to support his character when assailed."

So in *Davis v. Foster*, 68 Ind. 258, an instruction to the jury was held good, which asserted that, "if a man's neighbors say nothing whatever about him, as to his truthfulness, that fact of itself is evidence that his general reputation for truth is good." And in *Davis v. Franke*, 33 Grat. (Va.) 413, a witness who had an opportunity to know another's character was allowed to testify that he never heard it called in question; Staples, J., observing: "Possibly, in many cases, the highest tribute that can be paid to the witness is that his reputation as a man of veracity is never called in question, or even made the subject of conversation in the community where he resides."

In *Childs v. State*, 55 Ala. 28, a witness, who claimed to know the character of another witness, "but never heard his character discussed," was held competent to speak to the question of character. A like principle was declared in *Hadjo v. Gooden*, 13 Ala. 718.

Under the principle established by these authorities, we hold that the Circuit Court erred in excluding the question propounded, as to whether the two witnesses named in the record had ever heard of the defendant's having any other difficulty except the one in question. It was equivalent to the inquiry, whether the witnesses had ever heard anything *against* the character of the defendant for quiet, peace, or good order; and should have been allowed by the court.

The question propounded, calling for evidence *prima facie* relevant and legal, the refusal to allow it was error, although no answer, or proposed answer of the witnesses was stated. *Phœnix Ins. Co. v. Moog*, 78 Ala. 284.

5. The court did not err, however, in its rulings on the evidence otherwise bearing on the subject of the defendant's character. Particular acts, whether good or bad, or the repu-

[Hussey v. The State.]

tation of having done them, can not be shown in proof or rebuttal of good character, on the direct examination, although the rule is often otherwise on cross-examination. Evidence of character goes to general repute, not particular acts, or specified conduct, the parties litigant being presumed to be prepared to meet the one and not the other, which might often do injustice by taking by surprise. "This point," says Mr. Greenleaf, "has been much discussed, but may now be considered at rest."—1 Greenl. Ev. (14th Ed.), § 461; *Steele v. State*, 83 Ala. 20; *Jones v. State*, 76 Ala. 8; Whart. Crim. Ev. §§ 259–60. Such evidence, moreover, must be in the nature of reputation, and not the individual opinion of the witnesses as to the disposition or tendency of the prisoner's mind.—*Reg. v. Rowton*, 10 Cox Cr. Cases, 25. It was not competent to prove that the defendant was a member of the church; or that he was "a model man" in respect to the use of profane language, which he had been charged with using. So, the mere "opinion" of the witness Anderson that the defendant "was a timid man, and would rather avoid than provoke a difficulty."

6. The State introduced several witnesses who testified to the good reputation of the deceased, in the community in which he lived, for peace and quiet. The defendant, on cross-examination, was permitted to inquire of these witnesses, by way of testing the ground of their statement, whether they knew or had ever heard of various specified and notorious difficulties in which deceased had been involved, and in which he had used or threatened to use a deadly weapon. These witnesses having denied that they had ever heard of these difficulties, the defendant proposed to prove, as an independent fact, that these several difficulties had actually occurred, and also to prove their notoriety. The declared object of this evidence was to impeach these witnesses. This evidence was properly excluded. Under the rule above declared, it was incompetent to prove these specified difficulties in proof or rebuttal of good character. They were collateral and irrelevant to the issues in the case. And the rule is too well settled for discussion, both in practice and by authority, that "a witness can not be cross-examined as to any fact, which is collateral and irrelevant to the issues, merely for the purpose of contradicting him by other evidence, if he should deny them, and thereby discredit his testimony. And, if a question is put to the witness, which is collateral, or irrelevant to the issue, his answer can not be contradicted by

the party who asked the question; but it is conclusive against him."—1 Greenl. Ev. § 449. Of course, the rule is different where the fact inquired about is material, as affecting the credit of the witness, as showing bias or hostility against the opposite party; or where the witness has on a former occasion given a contradictory account of the same matter; or where one of the parties to the cause had offered to suborn his testimony, and other like cases.—*Bullard v. Lambert*, 40 Ala. 210; *McHugh v. State*, 31 Ala. 317; *Melhurst v. Collier*, 69 Eng. C. L. 377; *Harralson v. The State*, 82 Ala. 47. The proposal to prove the notoriety of the difficulties, in refutation of the denial of the witnesses that they had ever heard of them, was necessarily irrelevant, if the facts themselves were so, as independent transactions.

7. There was no error in allowing the State to prove the good character of the deceased for peace and quiet. The ground of objection to this evidence seems to be, that the general reputation of the deceased had not been put in issue, but only the particular traits of his character as a quick-tempered, violent man, easily provoked, and likely to provoke a difficulty. If these traits of disposition are provable at all—which we do not decide—they are not separable from the question of character. It is plain that the State could rebut this evidence by proof of defendant's reputation for peace and quiet, the whole question of character often going to the intent with which an alleged crime was committed, "the prevailing character of the party's mind, as evinced by the previous habits of his life, being a material element in discovering that intent in the instance in question."—1 Greenl. Ev. § 54, n. 3.

8. The portion of the court's charge which seems to have been copied from the opinion of this court in *Armor v. The State*, 63 Ala. 173, was a correct statement of the law bearing on this subject.—*State v. McMurphy*, 52 Mo. 251; *Coleman v. State*, 59 Miss. 490; *Kilgore v. State*, 74 Ala. 1; *Webster's case*, 5 Cush. (Mass.) 324; Ram on Facts, 96–7.

9. The testimony of Dr. Dement, to the effect that other physicians concurred with him in his opinion as to the nature of the wound of the deceased, was clearly hearsay, and not admissible. There is no more reason for permitting the unsworn assertions of experts to be detailed second-handed in court, than the like testimony of other persons. Each is equally hearsay, within the strictest meaning of the term.

[Cooper v. The State.]

*A. G. S. R. R. Co. v. Arnold*, 80 Ala. 600; *Vicksburg & Mer. R. R. Co. v. O'Brien*, 119 U. S. 99.

10. The defendant's wife was not a competent witness for him, as heretofore uniformly held by us, and she was properly excluded from testifying.—*Woods v. State*, 76 Ala. 35; *Johnson v. State*, 47 Ala. 7; 3 Brick. Dig. 824, §§ 35-42.

We need not consider in detail the other rulings on the evidence. We need only observe that we discover no error in them.

The other points raised, as to the alleged irregularities in the organization of the jury, the competency of the juror Williams, and other like contentions, need not be considered, as they will not probably arise on another trial.

The judgment will be reversed for the error above pointed out, and the cause will be remanded for a new trial. In the meanwhile, the defendant will be retained in custody until discharged by due course of law.