STATE OF NORTH CAROLINA v. SONDRA STEVENSON

No. 8518SC1149

(Filed 17 June 1986)

**Homicide § 28.4— self-defense—right to stand ground—right of temporary dweller**

Neither permanency of residence nor a leasehold interest in the premises is required before a person is legally justified in standing her ground, rather

than retreating before using deadly force in self-defense; rather, one must show only that she is a member of a household, however temporarily, and that she possesses an intent to reside in that particular place at the time of the attack. Therefore, the trial court erred in denying defendant's request for a special jury instruction on the absence of a duty to retreat in one's own home where the evidence tended to show that she was living in an apartment leased by deceased's girlfriend who had given her permission to stay there for "a week or so"; defendant moved her clothes, her husband's clothes, and the couple's stereo to the apartment; defendant and her husband had been living there for about five days, sharing an extra bedroom, at the time of the shooting; and they had no other residence.

APPEAL by defendant from *Mills, Judge.* Judgment entered 23 May 1985 in Superior Court, GUILFORD County. Heard in the Court of Appeals 14 February 1986.

*Attorney General Lacy H. Thornburg, by Associate Attorney General Mabel Y. Bullock, for the State.*

*Assistant Public Defender Ronald P. Butler, for defendant appellant.*

BECTON, Judge.

From a judgment imposing a six-year sentence following her voluntary manslaughter conviction, the defendant, Sondra Stevenson, appeals. Defendant argues that the trial court erred by refusing to give defendant's requested instruction that the defendant had no duty to retreat. We agree and grant defendant a new trial.

I

Defendant shot and killed William Curtis Albertson on 19 January 1985. Defendant and her husband, Michael Stevenson, began living in the apartment leased by the deceased man's girlfriend, Kimberly Forehand, about five days before the shooting. They had moved their clothes and stereo to Ms. Forehand's apartment, and she had given them permission to stay there for "a week or so." Prior to the shooting, Albertson stayed at Ms. Forehand's apartment frequently, but also maintained a separate residence.

On the night of the shooting, defendant, Michael Stevenson, Kimberly Forehand, and Albertson went to a local pool room and drank beer. The State's evidence tended to show that Albertson

had been drinking heavily and was intoxicated when the four left the pool room and returned to Ms. Forehand's apartment. Albertson continued drinking, and began arguing with Ms. Forehand about three Polaroid photographs of bruises inflicted by Albertson on Ms. Forehand a few weeks earlier. Albertson had often beaten Ms. Forehand during their four-year relationship, and she had brought and dropped assault charges against him on numerous occasions.

Albertson grabbed Ms. Forehand by the hair and either led or dragged her, holding her in a bent-over position with her face to the floor, to the living room. He sat on the couch, still clutching her by the hair, and she knelt on the floor. Albertson cut the back of Ms. Forehand's head with a pocketknife. Ms. Forehand testified that she then succeeded in convincing Albertson that it was "silly to fight like this." Unfortunately, Allen Holmes, the father of Ms. Forehand's seven-year-old son, Zack, stopped by at that moment to see his son, and Albertson became enraged. Albertson, who had been involved in a fist-fight with Allen Holmes on a prior occasion, attempted to go out after him. Ms. Forehand grabbed his arm to restrain him. Defendant entered at this point and assisted in restraining Albertson, holding him by the other arm. When he did not desist, the defendant took the .32 revolver that Albertson always carried on his belt and backed down the hallway.

Michael Stevenson testified that he came downstairs at this point and saw the defendant pointing a gun at Albertson and Ms. Forehand. He observed that Albertson was clutching Ms. Forehand's hair with his left hand and was holding a knife to her mouth. Michael Stevenson testified that Albertson said, "Tell her to give me my goddamn gun," pushed Ms. Forehand aside, and took a partial step toward the defendant with the knife pointed at her. Defendant shot, hitting Albertson in the abdomen.

Ms. Forehand's version of these facts differed in that she testified that the defendant backed down the hallway saying, "He's not going to hurt you. He's not going to hurt you." She further testified that she stood between Albertson and the defendant and that Albertson handed her the knife, at which point she told the defendant, "Sondra, I've got the knife. For God's sake, put it down." Ms. Forehand testified that she turned sideways and at that moment the defendant fired the fatal shot.

The defendant did not testify.

## II

Defendant assigns error to the trial court's denial of her request for a special jury instruction on the absence of a duty to retreat in one's own home. The duty to retreat requires a victim of an assault to retreat to the wall before using deadly force in self-defense. North Carolina, as does a majority of jurisdictions, recognizes the so-called "castle doctrine" as an exception to the retreat rule.

> . . . [A] person is not obliged to retreat when assaulted while in his [or her] dwelling house or within the curtilage thereof, whether the assailant be an intruder or another lawful occupant of the premises.

*State v. Browning*, 28 N.C. App. 376, 379, 221 S.E. 2d 375, 377 (1976).

The "castle doctrine" is derived from the principle that one's home is one's castle and is based on the theory that if a person is bound to become a fugitive from her own home, there would be no refuge for her anywhere in the world. As *Browning* made clear, this doctrine applies in North Carolina even when the attacker is, for example, a co-tenant.

Our determination whether defendant had a duty to retreat before using deadly force in self-defense turns on the extent to which "dwelling house" includes a residence other than one in which the defendant had a leasehold or ownership interest or in which defendant was clearly a permanent resident. The State argues that our holding in *State v. Harrison*, 56 N.C. App. 368, 289 S.E. 2d 50, *disc. rev. denied*, 306 N.C. 388, 294 S.E. 2d 214 (1982) is controlling. In *Harrison*, we held, based on the particular facts of that case, that the evidence adduced at trial was insufficient to indicate that defendant was in a place from which he had no duty to retreat when he stabbed the victim. We do not believe, as the State suggests, that *Harrison* stands for the general proposition that a person must have a proprietary or leasehold interest or be a permanent resident of a place before she can avail herself of the "castle doctrine." We believe that a person need only be a member of the household, however temporarily, with the intent to

make that place her residence, in order to invoke the "castle doctrine."

In a case decided by the Maryland Court of Appeals which is strikingly similar to the instant case, the Court looked to the analogous doctrine as it applies in the civil law:

> The phrase "dwelling place" is used . . . to denote any building or habitation, or part of it, in which the actor is at the time temporarily or permanently residing and which is in the exclusive possession of the actor, or of a household of which he is a member. Only that part of the building or other habitation which is actually used for residential purposes is a dwelling place. *Thus, a man's house is the dwelling place of himself, his family, his servants, and for the time being, the dwelling place of one who is residing, however temporarily, in the house as a guest.* It is not the dwelling place of a visitor, social or business, who comes to the house for a particular purpose and not to reside therein. (Emphasis supplied.)

*Barton v. State*, 46 Md. App. 616, 620, 420 A. 2d 1009, 1011-12 (1980) (quoting Restatement (Second) of Torts, Sec. 65 comment h (1965)).

In *Barton*, the defendant had followed his girlfriend, Wanda, to Baltimore from North Carolina, where he took up residence with Wanda and her two brothers. Defendant intended to stay there temporarily or until he and Wanda had saved enough money to move out on their own. The trial court's failure to give the requested "castle doctrine" instruction, based on the fact that defendant "had [no] proprietary or leasehold interest in the property whatsoever" was held to be reversible error.

We believe that the trial court in the instant case acted under a similar misapprehension of the law in refusing defendant's written, timely request for the "castle doctrine" instruction. In fact, the court stated as part of its basis for denial:

> I might be wrong. You might be completely right and I may be wrong, but that's the way I see it. . . . [T]he only person that I really know that lived there was [Ms. Forehand] . . . and her child and, perhaps, the deceased guy; that actually lived there *permanently.*

(Emphasis added.)

The trial court took too narrow a view of the "castle doctrine," requiring defendant to show that she lived in the apartment permanently before she could avail herself of this defense. The better rule requires courts to look to the intent of the party seeking to invoke the "castle doctrine."

Ms. Forehand admitted that the defendant and her husband asked to live in the apartment "for a week or so" because they had no place to stay, and that defendant's husband came back to the apartment as his home after work. Defendant moved her clothes, her husband's clothes, and the couple's stereo to the apartment. Defendant and her husband had been living there for about five days, sharing an extra bedroom, at the time of the shooting. They had no other residence.

We hold that the evidence adduced fairly permits the inference that Ms. Forehand's apartment was defendant's only place of shelter and that, however temporarily, she considered that apartment her home. The trial court should have instructed the jury that defendant had no duty to retreat because she was a member of the household at the time of the affray.

A person may have no permanent or proprietary status in a particular residence, yet the intent to reside there, however temporarily, fully implicates the policy underlying the "castle doctrine." For example, a battered woman may flee a violent or abusive partner and go to stay temporarily with a friend or relative or in a shelter for battered women. If the abuser tracks her down and attacks her in the temporary shelter, is the temporary shelter not her "residence," since she intended to stay there temporarily? If she be forced to flee her temporary home, "whither shall [s]he flee, and how far, and when may [s]he be permitted to return." *Jones v. State*, 76 Ala. 8, 16 (1884).

We hold, therefore, that neither permanency of residence nor a leasehold interest in the premises is required before a person is legally justified in standing her ground, rather than retreating before using deadly force in self-defense. One must show only that she is a member of a household, however temporarily, and that she possesses an intent to reside in that particular place at the time of the attack.

The instruction which defendant requested was correct in law and supported by the evidence. *See State v. Bradley*, 65 N.C.

App. 359, 309 S.E. 2d 510 (1983). We believe that a different result could well have been reached had the requested instruction been given. *See* N.C. Gen. Stat. Sec. 15A-1443(a) (1983). The failure to instruct on the "castle doctrine," therefore, constituted prejudicial error, and defendant is entitled to a new trial.

The issues raised by defendant in her remaining assignments of error are not likely to recur, and we need not consider them.

New trial.

Judges JOHNSON and MARTIN concur.