IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-50

Filed 31 December 2024

Wake County, No. 20CRS211814–15

STATE OF NORTH CAROLINA

v.

ALLEN JHALIL WILLIAMS, Defendant.

Appeal by defendant from judgment entered 1 March 2023 by Judge A. Graham Shirley in Wake County Superior Court. Heard in the Court of Appeals 22 October 2024.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Michael T. Henry, for the State.*
>
> *Patterson Harkavy LLP, by Narendra K. Ghosh, for defendant-appellant.*

FLOOD, Judge.

Defendant Allen Jhalil Williams appeals from the trial court's judgment after a jury found him guilty of voluntary manslaughter and possession of a firearm by a felon.[1] Defendant argues on appeal that the trial court reversibly erred in failing to instruct the jury on the castle doctrine theory of self-defense under N.C. Gen. Stat. § 14-51.2, and if Defendant was entitled to a castle doctrine instruction, the trial court

---

[1] On appeal, Defendant does not challenge his conviction or separate judgment for possession of a firearm by a felon.

erred in instructing the jury on the consequences of using excessive force in self-defense. Upon careful review, we conclude Defendant has demonstrated by competent evidence that he was entitled to a castle doctrine instruction, and the trial court's failure to provide such instruction was prejudicial to Defendant's case. We therefore reverse and remand for a new trial, and as such, do not reach Defendant's remaining argument on the excessive force instruction.

## I. **Factual and Procedural Background**

In the summer of 2020, Defendant and Miracle Lewis—both of whom were residents of Raleigh, North Carolina—met on Facebook, and Defendant expressed interest in meeting her in-person. After exchanging messages on Facebook for a few weeks, the pair agreed that they would meet on the evening of 1 August 2020.

*The Shooting*

On the agreed-upon day, at approximately 10:15 p.m., Defendant drove his car—a black Cadillac sedan—to Lewis' home. Lewis came out of her home, the pair talked on the front porch, and they then talked in Defendant's car. The pair eventually decided to drive around, and after stopping at a local gas station, they returned and parked in the street outside of Lewis' home and continued to converse in Defendant's car.

Approximately ten minutes after the pair returned to Lewis' home, a white pickup truck occupied by Martin Penny and driven by his brother, Tyrell Peguese, pulled up in front of Lewis' home. Lewis had recently ended an eight-month "on-

again-off-again" romantic relationship with Penny, and prior to the night of 1 August 2020, Defendant had met neither Penny nor Peguese.

After pulling in front of Lewis' home, Penny exited the passenger's side of the truck and walked to the front door of the home. Penny then saw Defendant's car and began walking towards it. The evidence tends to show that, after Penny reached Defendant's car, Defendant and Penny had a hostile verbal exchange, Defendant exited his car, Defendant and Penny then had a physical altercation, and Defendant lethally shot Penny. After being shot, Penny stumbled backwards towards Lewis' home and collapsed in her back yard. Defendant—keeping on his person the gun he used to shoot Lewis—then got in his car and drove away. Following Defendant's departure, Lewis called 9-1-1; first responders eventually arrived on the scene, and they found Penny with no signs of life. Penny had been shot twice, and upon transport to WakeMed Hospital, he was pronounced dead.

Soon after the first responders' arrival, police officers arrived on the scene. Lewis informed the officers that the shooting was the result of a conflict between Defendant and Penny, and explained that she knew Defendant only by his Facebook pseudonym of "Sleazy So." While attempting to aid the officers in identifying Defendant, however, Lewis discovered that Defendant's Facebook profile had been deactivated and was no longer accessible. Despite this, using Lewis' Facebook account and surveillance footage from the gas station she and Defendant had visited, police were able to ascertain Defendant's identity. The following day, police located

Defendant's black Cadillac in a cul-de-sac near the scene of the shooting. Police conducted a search of the car, which revealed a .22 caliber revolver loaded with four unfired rounds, out of a possible six.

For the remainder of August, police were unable to locate and apprehend Defendant, as following the shooting, Defendant fled to New York, where he spoke with "John Gotti's hitman's lawyer" about self-defense. In early September, however, Defendant returned to North Carolina to meet with another potential romantic interest at a hotel on Glenwood Avenue in Raleigh, and on 10 September 2020, he was apprehended within minutes of his arrival at the hotel.

On 14 September 2020, Defendant was charged by two bills of indictment for murder and possession of a firearm by a felon. On 20 February 2023, this matter came on for hearing before the trial court.

*Testimonial Evidence*

During the presentation of evidence, the State presented the witness testimonies of Lewis and Peguese, who recounted, in relevant part, the events that transpired between the moment Penny approached Defendant's car, and when Defendant fled the scene.

According to Lewis, after Penny approached the passenger's side of Defendant's car, Penny tapped on the window and asked Defendant to identify himself, and Defendant did not answer. Penny then opened the passenger door, again asked Defendant to identify himself, and leaned into the car and over Lewis, and

punched Defendant.  After throwing this punch, Penny withdrew from inside the passenger's side of the car, and walked around the front of the car toward the driver's side.  Lewis also exited the car, but remained on the passenger's side.  When Penny reached the driver's side, Defendant exited the car, stood, and "scuffl[ed]" with Penny in the street.  Soon after, within "[s]econds," Lewis heard "[t]wo or three" gunshots, followed by Penny stumbling towards Lewis' home and collapsing in her back yard.  Lewis never saw a gun during the entire incident, either on Penny or Williams.

Peguese's account of these events was partially consistent with that of Lewis, but according to Peguese, when Defendant exited his car, he already had a gun in hand, immediately "started shooting," and fired three or four shots at Penny.  Peguese further testified that, before the shooting, there was no fighting or "scuffling" between Defendant and Penny.

Following the State's evidence, Defendant also testified as to the events surrounding the shooting.  According to Defendant, after Penny approached Defendant's car, Penny opened the passenger's side door and asked Lewis, "[w]ho the fuck is this?"  Lewis did not respond, and Penny leaned halfway into the car and asked Defendant, "[w]ho the fuck are you?"  Before Defendant could answer, Penny, while still leaning into the car, began punching Defendant in the face.  Defendant tried to block the punches and open his driver's side door, but had trouble opening the door, as the inside door handle was broken.  Penny eventually stopped punching Defendant, whereupon Defendant observed Penny had a gun in his hand.  Defendant,

while seated, managed to disarm Penny, who then resumed punching Defendant; amidst these punches, Defendant successfully opened the driver's side door, exited the car, and stood up.

Immediately after Defendant exited the car, Penny withdrew from the passenger's side, went around the front of the car, and met Defendant on the driver's side. Defendant then pointed the gun at Penny and asked him, "[w]hat the hell are you doing?" Penny did not respond, and instead "rushe[d]" at, and began to physically attack, Defendant. Penny grabbed Defendant's wrist, repeatedly punched him, and yelled profanities, all while Defendant tried to prevent Penny from obtaining the gun. Eventually, Penny punched Defendant in the eye, and Defendant began to hear ringing in his ears. At this point, according to Defendant, "for fear of [Penny] . . . knocking [him] out and taking the gun back[,]" Defendant shot Penny a single time. Despite being shot, Penny continued to attack Defendant and again punched him in the eye, and in "fear for [his] life[,]" Defendant once more shot Penny. After firing the second shot, Defendant was able to break free from Penny, and Penny stumbled away.

Upon recounting these events, Defendant testified that he got in his car and fled the scene because he heard yelling from someone in Peguese's pickup truck, and feared its occupant may be armed. Defendant further testified that he deactivated his Facebook account because he was afraid the altercation may have been a "setup situation" orchestrated by Lewis, and that he fled to New York because he felt he

- 6 -

should "talk to a lawyer" before "turn[ing] [him]self in," though he acknowledged that he never did, ultimately, turn himself in.

In support of his testimony, Defendant also presented the testimony of a bystander, Kenneth Blocker, who lived across the street from Lewis. Blocker testified that, at the time of the incident, he was in his bedroom, heard a loud argument for about ten to fifteen minutes, and then heard "two to three gunshots."

*Jury Instructions and Sentencing*

The hearing came to the charge conference, whereupon the trial court informed the parties that it would instruct the jury on self-defense. Defendant requested an instruction under the "castle doctrine" statute, N.C. Gen. Stat. § 14-51.2. The State objected to Defendant's request, arguing that, per the language of the statute and the facts of this case, Defendant was not entitled to an instruction under this theory of self-defense.

After hearing the parties' arguments, the trial court denied Defendant's request, reasoning that, while the statute, in defining "home," specifically includes the home's "curtilage," the statute's definition of "motor vehicle" includes no such description. The trial court further reasoned that the statute applies only to an "occupant" of a motor vehicle, and the evidence suggested there were "no occupant[s]" in Defendant's vehicle at the time of the shooting; rather, Penny had exited Defendant's vehicle, was no longer attempting to enter the vehicle, and Defendant and Penny had "reenter[ed] an affray" in the street. While noting that Defendant

"still [had] the right of self-defense," the trial court concluded that granting Defendant's instructional request "would essentially be a [rewriting] of the statute."

The trial court thereafter instructed the jury on first degree murder, the lesser-included offenses of second degree murder and voluntary manslaughter, self-defense, and possession of a firearm by a felon. As part of its voluntary manslaughter instruction, the trial court provided, "[i]f the State proves beyond a reasonable doubt that . . . [D]efendant, though otherwise acting in self-defense, used excessive force, . . . [he] would be guilty of voluntary manslaughter."

On 28 February 2023, following jury deliberations, Defendant was found guilty of voluntary manslaughter and possession of a firearm by a felon. Defendant stipulated to an aggravating factor, and on 1 March 2023, the trial court entered judgment, sentencing Defendant in the aggravated range to a term of 105 to 138 months' imprisonment for voluntary manslaughter, and in the presumptive range to a consecutive term of 19 to 35 months' imprisonment for possession of a firearm by a felon. Defendant timely appealed.

## II. Jurisdiction

In filing written notice of appeal, Defendant's counsel failed to identify the judgments from which Defendant appeals, as well as the court to which appeal is taken, and Defendant's appeal therefore fails to comply with Rule 4(b) of the North Carolina Rules of Appellate Procedure. N.C. R. App. P. 4(b) ("The notice of appeal . . . shall designate the judgment or order from which appeal is taken and the court to

which appeal is taken[.]"). Defendant has therefore filed with this Court a petition for writ of certiorari ("PWC"), requesting we issue our discretionary writ should Defendant's notice be found insufficient to confer upon this Court jurisdiction. *See State v. Rouson*, 226 N.C. 562, 563–64, 741 S.E.2d 470, 471 (2013) ("A [PWC] . . . must show merit or that error was probably committed below. *Certiorari* is a discretionary writ, to be issued only for good and sufficient cause shown." (citation and internal quotation marks omitted)).

Even where a defendant's appeal fails to comply with Rule 4(b), this Court has provided that "a mistake in designating the judgment should not result in loss of the appeal as long as the intent to appeal from a specific judgment can be *fairly inferred* from the notice and the appellee is not misled by the mistake." *Stephenson v. Bartlett*, 177 N.C. App. 239, 241, 628 S.E.2d 442, 443 (2006) (citation and internal quotation marks omitted). Further, "this Court has noted that failure to . . . identify the court to which the appeal is taken [is] not the sort[] of defect[] requiring dismissal of an appeal on a jurisdictional basis[,]" and we "have also granted *certiorari* review . . . where . . . the State lodges no substantive argument against such review." *State v. Hammond*, 288 N.C. App. 58, 62, 884 S.E.2d 767, 770 (2023) (citations and internal quotation marks omitted).

Here, while Defendant's notice of appeal did not designate the judgments from which Defendant takes appeal, the intent to appeal from these judgments may be fairly inferred because the notice was timely filed on the same day as the judgments'

entry, the notice included the case numbers for the judgments, and there are no other judgments from which Defendant could have taken appeal. *See Stephenson*, 177 N.C. App. at 241, 628 S.E.2d at 443. Further, as set forth above, Defendant's failure to identify the court to which he takes appeal is not the sort of defect requiring dismissal on a jurisdictional basis, and the State, in its response to Defendant's PWC, lodges no substantive argument against our granting of certiorari. *See Hammond*, 288 N.C. App. at 62, 884 S.E.2d at 770. Accordingly, in our discretion, we allow Defendant's PWC in 20CRS211814 and proceed to the merits of his appeal. *See Rouson*, 226 N.C. at 563–64, 741 S.E.2d at 471.

### III. Standard of Review

We review "a challenge to a trial court's decision regarding jury instructions *de novo*," *State v. Wirt*, 263 N.C. App. 370, 376, 822 S.E.2d 668, 673 (2018) (citation omitted), and under such review, this Court "considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Clapp*, 235 N.C. App. 351, 359–60, 761 S.E.2d 710, 717 (2014) (citation and internal quotation marks omitted).

In reviewing the denial of a defendant's request for a self-defense instruction, we must be heedful of the trial court's duty "to instruct the jury on all substantial features of a case raised by the evidence." *State v. Shaw*, 322 N.C. 797, 803, 370 S.E.2d 546, 549 (1988). "When supported by competent evidence, self-defense unquestionably becomes a substantial and essential feature of a criminal case[, and

f]or this reason, a defendant is entitled to an instruction on self-defense when he . . . presents competent evidence of such." *State v. Parks*, 264 N.C. App. 112, 115, 824 S.E.2d 881, 884 (2019) (citations and internal quotation marks omitted).

"In determining whether a defendant has presented competent evidence sufficient to support an instruction for self-defense, we take the defendant's evidence as true and consider it in the light most favorable to the defendant." *Id.* at 115, 824 S.E.2d at 884 (citation omitted). Even where this Court finds the trial court committed instructional error, we reverse and remand for a new trial only upon a defendant's demonstration of prejudice, whereby he must show "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." *State v. Dilworth*, 274 N.C. App. 57, 61, 851 S.E.2d 406, 409 (2020) (citation and internal quotation marks omitted); *see also Parks*, 264 N.C. App. at 115, 824 S.E.2d at 884.

## IV. <u>Analysis</u>

Defendant argues on appeal: the trial court reversibly erred in failing to instruct the jury on the castle doctrine theory of self-defense under N.C. Gen. Stat. § 14-51.2 (2023); and, if Defendant was entitled to a castle doctrine instruction, the trial court erred in instructing the jury on the consequences of using excessive force in exercising self-defense. We address Defendant's castle doctrine instruction argument, and as explained in further detail below, need not reach Defendant's remaining argument.

In alleging reversible error, Defendant contends, (A) viewing the evidence in the light most favorable to Defendant, the trial court's denial of his request for a castle doctrine instruction was instructional error, and (B) the error was prejudicial to his case. We first address his allegation of instructional error.

## A. Instructional Error

Under the North Carolina common law right to self-defense, a defendant may be altogether excused for killing another if the killing was done in perfect self-defense, which requires a showing that,

> at the time of the killing, these four elements existed:
>
> (1) it appeared to [the] defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and
>
> (2) [the] defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness; and
>
> (3) [the] defendant was not the aggressor in bringing on the affray, *i.e.*, he did not aggressively and willingly enter into the fight without legal excuse or provocation; and
>
> (4) [the] defendant did not use excessive force, *i.e.*, did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. McLymore*, 380 N.C. 185, 190–91, 868 S.E.2d 67, 72 (2022) (citation omitted).

Distinct from common law perfect self-defense is the common law "castle doctrine"—or "defense of habitation"—which excepts one "assaulted while in his

dwelling house or within the curtilage thereof" from having a duty to retreat. *State v. Stevenson*, 81 N.C. App. 409, 412, 344 S.E.2d 334, 335 (1986) (citation omitted) (cleaned up); *see also State v. Vaughn*, ___ N.C. App. ___, ___, 901 S.E.2d 260, 265 (2024) (referring to the castle doctrine as "defense of habitation"). In 1993, the General Assembly enacted N.C. Gen. Stat. § 14-51.1 (2011) (repealed 2011), which codified and broadened the common law castle doctrine "to make the use of deadly force justifiable whether to *prevent* unlawful entry into the home or to *terminate* an unlawful entry by an intruder[,]" *State v. Blue*, 356 N.C. 79, 89, 565 S.E.2d 133, 139 (2002), and provided, in relevant part, that a "lawful occupant within a home or other place of residence is justified in using any degree of force . . . against an intruder[.]" N.C. Gen. Stat. § 14-51.1(a) (repealed 2011).

In 2011, however, the General Assembly repealed N.C. Gen. Stat. § 14-51.1 and "replaced it with a more detailed statutory scheme that expanded and clarified use of force protections." *State v. Philips*, 386 N.C. 513, 520, 905 S.E.2d 23, 29 (2024) (citation omitted). Included in this enacted statutory scheme was N.C. Gen. Stat. § 14-51.2, which again codified the common law castle doctrine, and while not repealing or limiting the common law standard, further broadened it to include self-defense executed in a home, workplace, or motor vehicle. *See State v. Austin*, 279 N.C. App. 377, 378, 865 S.E.2d 350, 352 (2021) ("[T]he castle doctrine defense . . . is codified in [N.C. Gen. Stat.] § 14-51.2."); *see also Vaughn*, ___ N.C. App. at ___, 901 S.E.2d at 265 ("N.C. Gen. Stat. § 14-51.2 codifies the defense of habitation[.]"); *State v. Benner*, 380

N.C. 621, 629, 869 S.E.2d 199, 205 (2017) (providing that N.C. Gen. Stat. § 14-51.2 was "not intended to repeal or limit any other defense that may exist under the common law" (internal quotation marks omitted)).

The statutory castle doctrine standard, articulated in N.C. Gen. Stat. § 14-51.2(b), functions as a burden-shifting provision, whereby, in addition to having no duty to retreat, "the defendant no longer has the burden to prove key elements of the traditional self-defense doctrine." *Austin*, 279 N.C. App. at 380, 865 S.E.2d at 353; *see also* N.C. Gen. Stat. § 14-51.2(f). Pursuant to the statute,

> [t]he lawful occupant of a home, motor vehicle, or workplace is *presumed* to have held a reasonable fear of imminent death or serious bodily harm to himself . . . or another when using defensive force that is intended or likely to cause death or serious bodily harm to another if both of the following apply:
>
> (1) The person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, a home, motor vehicle, or workplace, or if that person had removed or was attempting to remove another against that person's will from the home, motor vehicle, or workplace.
>
> (2) The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred.

N.C. Gen. Stat. § 14-51.2(b)(1)–(2) (emphasis added). Further, "[a] person who uses force as permitted by [N.C. Gen. Stat. § 14-51.2(b)] . . . is justified in using such force and is immune from civil or criminal liability for the use of such force[.]" N.C. Gen. Stat. § 14-51.2(e). While the castle doctrine affords a defendant the presumption of

justified deadly force, this presumption is rebuttable and does not apply under certain circumstances, including those where "[t]he person against whom the defensive force is used (i) has discontinued all efforts to unlawfully and forcefully enter the home, motor vehicle, or workplace and (ii) has exited the home, motor vehicle, or workplace." N.C. Gen. Stat. § 14-51.2(c)(5).

Here, the uncontroverted Record evidence demonstrates that Defendant, for much of the night of the incident, was lawfully in and operating his car—a motor vehicle—meaning that, if Defendant was an "occupant" of a motor vehicle, such occupancy was "lawful[.]" N.C. Gen. Stat. § 14-51.2(b). As such, for Defendant to have been entitled to a castle doctrine instruction, the Record must demonstrate: (1) at the time Defendant used lethal force against Penny, Defendant was an "occupant" of a motor vehicle; and (2) Penny was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, the motor vehicle, and Defendant knew or had reason to believe such unlawful and forcible entry was occurring or had occurred. *See* N.C. Gen. Stat. § 14-51.2(b)(1)–(2).

### 1. Occupant of a Motor Vehicle

Our analysis of whether Defendant was an "occupant" of his motor vehicle reveals "a question of statutory interpretation, which is a question of law reviewed de novo." *State v. Campbell*, 285 N.C. App. 480, 486, 878 S.E.2d 312, 317 (2022) (citation omitted).

"In addressing issues of statutory interpretation, our Supreme Court has

stated that 'the principal goal of statutory construction is to accomplish the legislative intent.'" *Id.* at 486–87, 878 S.E.2d at 318 (quoting *Wilkie v. City of Boiling Spring Lakes*, 370 N.C. 540, 547, 809 S.E.2d 853 (2018)). "While we have acknowledged that we can infer legislative intent from the language of the statute, the spirit of the act[,] and what the act seeks to accomplish, our Supreme Court has held that statutory interpretation begins with an examination of the plain words of the statute." *Id.* at 487, 878 S.E.2d at 318 (citation and internal quotation marks omitted) (cleaned up). Where "statutory language is clear and unambiguous, th[is C]ourt eschews statutory construction in favor of giving the words their plain and definite meaning." *Id.* at 487, 878 S.E.2d at 318 (citation and internal quotation marks omitted).

Where this Court concludes statutory language is ambiguous or unclear as to its meaning, however, we "must further interpret the statute to give effect to the legislative intent, which includes employing canons of statutory interpretation." *Id.* at 487, 878 S.E.2d at 318 (citation and internal quotation marks omitted). In construing a statute, "[p]arts of the same statute dealing with the same subject matter must be considered and interpreted as a whole[,]" *State v. Rankin*, 371 N.C. 885, 889, 821 S.E.2d 787, 792 (2018) (citation and internal quotation marks omitted), and we will "normally adopt an interpretation which will avoid absurd or bizarre consequences, the presumption being that the legislature acted in accordance with reason and common sense and did not intend untoward results." *Romulus v. Romulus*, 216 N.C. App. 28, 34, 715 S.E.2d 889, 893 (2011) (citation omitted).

### a. *Plain Language Meaning*

To determine the meaning of the word "occupant" as used in the statutory castle doctrine, we first look to the plain language of the statute itself. *See Campbell*, 285 N.C. App. at 487, 878 S.E.2d at 319. Under N.C. Gen. Stat. § 14-51.2(a), the General Assembly provided definitions of the material statutory terms, but not included among these defined terms is the word "occupant." N.C. Gen. Stat. § 14-51.2(a)(3), however, provides that "[m]otor vehicle" is afforded its meaning as defined under N.C. Gen. Stat. § 20-4.01 (2023), which sets forth the definitions of terms used throughout the North Carolina motor vehicle statute. *See* N.C. Gen. Stat. § 20-4.01(23). For the purposes of our review, though, N.C. Gen. Stat. § 20-4.01 is not elucidative; while the words "[o]perator" and "[o]wner" are included as defined terms, the word "occupant"—although mentioned four times throughout the statute—is not afforded a definition. *See* N.C. Gen. Stat. § 20-4.01(1), (23a), (27)b., (46a).

As a pertinent use of the word "occupant" is undefined within the current statutory scheme, we next consider whether the word has been given meaning by judicial decision. *See In re Oak Meadows Cmty. Ass'n*, 293 N.C. App. 92, 96, 899 S.E.2d 404, 407 (2024) (providing that where a word "has not been defined by statute or judicial decision[,] . . . we look to its natural, approved and recognized meaning" (citation and internal quotation marks omitted)). In *State v. Tripp*, our Supreme Court considered whether, under the relevant facts of the case—where, at the time police officers executed a search warrant of the defendant's residence, he was outside

"on a wheelchair ramp on the neighboring property"—the defendant could be considered an "occupant" of his residence. 381 N.C. 617, 619, 631–32, 873 S.E.2d 298, 302, 308–09 (2022) (citation and internal quotation marks omitted). Upon review, the Court concluded that—though "not within the lawful limits of his residence"— where the defendant was within the "immediate vicinity" of, and "close enough" such that he could have "had access to[,]" the residence, he was indeed a legal "occupant[.]" *Id.* at 631–32, 873 S.E.2d at 308–09 (citations and internal quotation marks omitted). The facts of *Tripp*, however, concerned Fourth Amendment protections and real estate jurisprudence, and our Supreme Court set forth its interpretation of "occupant" under the context of a defendant's reasonable expectations of privacy, officer safety, and property ownership. *See id.* at 630–31, 873 S.E.2d at 308–09; *see also State v. Wilson*, 371 N.C. 920, 925, 821 S.E.2d 811, 815 (2018) (defining "occupant" in the context of Fourth Amendment Rights, and whether a defendant poses "a real threat to the safe and efficient execution of [a] search warrant" (citation and internal quotation marks omitted)). As such, this meaning of "occupant" is not germane to the instant case, in the context of entitlement to a statutory castle doctrine instruction.

Where a word "has not been defined by statute or judicial decision[,] . . . we look to its natural, approved and recognized meaning[,]" and in doing so, "courts may look to dictionaries to determine the ordinary meaning of words within a statute." *In re Oak Meadows Cmty. Ass'n*, 293 N.C. App. at 96, 899 S.E.2d at 407 (citations and internal quotation marks omitted). Per Black's Law Dictionary, "occupant" may be

defined, in relevant part, as "[s]omeone who has . . . control over[] certain property or premises." *Occupant*, Black's Law Dictionary (12th ed. 2024).

Applying this definition of "occupant" to the statutory castle doctrine, for a defendant to have been an "occupant" of a motor vehicle, competent evidence must demonstrate he had "control over" the vehicle. *See* N.C. Gen. Stat. § 14-51.2(b); *see also Parks*, 264 N.C. App. at 115, 824 S.E.2d at 884; *Occupant*, Black's Law Dictionary (12th ed. 2024). From this interpretation, one may reasonably conclude a defendant was an "occupant" of a motor vehicle where he had the ability to exercise actual, physical control of said vehicle. *See State v. Hoque*, 269 N.C. App. 347, 353, 837 S.E.2d 464, 470–71 (2020) (providing that "actual physical control of a vehicle" may be demonstrated where a defendant was seated "behind the wheel of [the vehicle] with the engine running"); *see also* N.C. Gen. Stat. § 20-4.01(25). As applied to the instant case, where Defendant exercised deadly force after exiting through, and while standing directly outside of, the driver's side door of his motor vehicle, Defendant would not be considered an "occupant" of the vehicle. *See Hoque*, 269 N.C. App. at 353, 837 S.E.2d at 470–71.

Conversely, per our Supreme Court's prior consideration of "control" over a location, another reasonable conclusion is that a defendant may be considered an "occupant" of a motor vehicle where he had the opportunity and ability to access and enter, and therefore control, the vehicle. *See State v. Chekanow*, 370 N.C. 488, 497–98, 809 S.E.2d 546, 553 (2018) (providing that indicators of a defendant's "control"

over a location include his "opportunity to place contraband" on the premises, and his "possess[ion of] a key to" the location). As applied to the instant case, per the material facts delineated above, Defendant *would* be considered an "occupant" of his motor vehicle, which is an outcome irreconcilable with that of the first interpretation. *See id.* at 497–98, 809 S.E.2d 553.

As the dictionary definition of "occupant" yields two reasonable, but contradictory, conclusions on whether Defendant was an "occupant" of a motor vehicle, this Court is unable to ascertain legislative intent from the natural, approved, and recognized meaning of the term. *See In re Oak Meadows Cmty. Ass'n*, 293 N.C. App. at 96, 899 S.E.2d at 407; *see also Campbell*, 285 N.C. App. at 487, 878 S.E.2d at 319; *Occupant*, Black's Law Dictionary (12th ed. 2024). We therefore find the statutory castle doctrine's use of the term "occupant" to be ambiguous and unclear in its meaning, and to give effect to legislative intent, we must employ additional canons of statutory interpretation. *See Campbell*, 285 N.C. App. at 487, 878 S.E.2d at 318; *see also* N.C. Gen. Stat. § 14-51.2(b).

### b. *Language, Object, and Spirit of the Castle Doctrine*

To effectuate legislative intent, we assess the language, object, and spirit of the statutory castle doctrine. *See id.* at 487, 878 S.E.2d at 318; *see also Rankin*, 371 N.C. at 889, 821 S.E.2d at 792.

As to the language of the statutory castle doctrine, it is well established that the common law castle doctrine governs only defensive force exercised "while in

[one's] . . . dwelling house or within the curtilage thereof[.]" *Stevenson*, 81 N.C. App. at 412, 344 S.E.2d at 335; *see also Blue*, 356 N.C. at 86–87, 565 S.E.2d at 138. In codifying the castle doctrine, however, the General Assembly broadened its applicability to include defensive force exercised in a home, motor vehicle, *or* workplace, and set forth that the presumption of reasonable fear is afforded to a lawful occupant "of" the aforementioned locations. *See* N.C. Gen. Stat. § 14-51.2(b). This differs from the common law standard and that of N.C. Gen. Stat. § 14-51.1, which afford the presumption to a lawful occupant "within" a home or dwelling. *See Stevenson*, 81 N.C. App. at 412, 344 S.E.2d at 335; *see also* N.C. Gen. Stat. § 14-51.1 (repealed 2011). Additionally, in setting forth the requisite conditions for a statutory castle doctrine instruction, the General Assembly provided that a lawful occupant of a home, motor vehicle, or workplace is afforded the presumption of reasonable fear, where, in relevant part: "(1) The person against whom the defensive force was used . . . had unlawfully and forcibly entered, . . . [or] *had removed* . . . another against that person's will from[,] the home, motor vehicle, or workplace"; and "(2) The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or . . . act . . . *had occurred*." N.C. Gen. Stat. § 14-51.2(b)(1)–(2) (emphasis added).

As to the object of the statutory castle doctrine, per the relevant statutory language set forth above, considered and interpreted as a whole, it is apparent that the statute's purpose was to expand the common law standard, such that it governs defensive force in a motor vehicle or workplace—not just in a home. *See* N.C. Gen.

Stat. § 14-51.2(b). It is also evident that, by including governance over conditions where an assailant "had removed" a lawful occupant from his home, motor vehicle, or workplace, the General Assembly contemplated circumstances where one exercises justified force while not physically "within" those locations. *See* N.C. Gen. Stat. § 14-51.2(b)(1); *see also Rankin*, 371 N.C. at 889, 821 S.E.2d at 792. This interpretation is strengthened by the statute's applicability to the lawful occupant "of" a home, motor vehicle, or workplace, indicating that—unlike the standard at common law and under the N.C. Gen. Stat. § 14-51.1—one need not necessarily be "within" these locations to be granted the benefits of the statutory castle doctrine. *See* N.C. Gen. Stat. § 14-51.2(b); *see also Stevenson*, 81 N.C. App. at 412, 344 S.E.2d at 335; N.C. Gen. Stat. § 14-51.1 (repealed 2011).

This interpretation of N.C. Gen. Stat. § 14-51.2(b) also adheres to the spirit of the castle doctrine, which is informed by our appellate courts' prior expositions of the common law standard. Specifically, this Court has provided that the common law "'castle doctrine' is derived from the principle that one's home is one's castle and is based on the theory that if a person is bound to become a fugitive from [his] own home, there would be no refuge for [him] anywhere in the world." *Stevenson*, 81 N.C. App. at 412, 344 S.E.2d at 335; *see also Austin*, 279 N.C. App. at 378, 865 S.E.2d at 352; *Vaughn*, ___ N.C. App. at ___, 901 S.E.2d at 265. Consistent with this foundational principle, regarding the common law castle doctrine standard, our Supreme Court has articulated the following:

> When a trespasser enters upon a man's premises, makes an assault upon his dwelling, and attempts to force an entrance into his house in a manner such as would lead a reasonably prudent man to believe that the intruder intends to commit a felony or to inflict some serious personal injury upon the inmates, a lawful occupant of the dwelling may legally prevent the entry, even by taking the life of the intruder. Under those circumstances, the law does not require such householder to flee *or to remain in* his house until his assailant is upon him, but he may open his door and shoot his assailant[.]

*Blue*, 356 N.C. at 86–87, 565 S.E.2d at 138 (citation and internal quotation marks omitted) (emphasis added); *see also Benner*, 380 N.C. at 629, 869 S.E.2d at 205.

As aforesaid, the enactment of N.C. Gen. Stat. § 14-51.2(b) served as a codification of the common law castle doctrine, while expanding the common law standard to govern defensive force exercised in a motor vehicle or workplace, as well as the home. *See Austin*, 279 N.C. App. at 378, 865 S.E.2d at 352; *see also Vaughn*, ___ N.C. App. at ___, 901 S.E.2d at 265; *Benner*, 380 N.C. at 629, 869 S.E.2d at 205. The common law castle doctrine's foundational principle, as well as its relevant standard articulated by our Supreme Court, may therefore instruct the spirit of the broader, statutory castle doctrine: as a person is not bound to become a fugitive from his own home, motor vehicle, *or* workplace, *see Stevenson*, 81 N.C. App. at 412, 344 S.E.2d at 335, he is under no requirement to flee *or to remain in* such location until his assailant is upon him. *See Blue*, 356 N.C. at 86–87, 565 S.E.2d at 138.

Upon our assessment of the statutory castle doctrine's language, object, and spirit, considering and interpreting as a whole the material provisions of N.C. Gen. §

14-51.2, we conclude the following interpretation of the statutory castle doctrine to be consistent with its legislative intent: the lawful occupant "of" a home, motor vehicle, or workplace is not bound to become a fugitive from these locations, and therefore is not required to flee *or remain in* his home, motor vehicle, or workplace until his assailant is upon him. *See* N.C. Gen. § 14-51.2(b); *see also Stevenson*, 81 N.C. App. at 412, 344 S.E.2d at 335; *Blue*, 356 N.C. at 86–87, 565 S.E.2d at 138; *Austin*, 279 N.C. App. at 378, 865 S.E.2d at 352; *Vaughn*, ___ N.C. App. at ___, 901 S.E.2d at 265; *Benner*, 380 N.C. at 629, 869 S.E.2d at 205; *Rankin*, 371 N.C. at 889, 821 S.E.2d at 792. Rather, the lawful occupant, under specific circumstances— including those where he is *no longer within* the home, motor vehicle, or workplace— may exercise deadly defensive force against his assailant. *See* N.C. Gen. Stat. § 14-51.2(b)(1); *see also Stevenson*, 81 N.C. App. at 412, 344 S.E.2d at 335; N.C. Gen. Stat. § 14-51.1 (repealed 2011).

## c. *Application to the Instant Case*

Here, in support of its denial of Defendant's request for a castle doctrine instruction, the trial court reasoned that, as N.C. Gen. Stat. § 14-51.2 does not include "curtilage" in its definition of a motor vehicle, Defendant could not have exercised force in the "curtilage" of the vehicle. The trial court further reasoned that, at the time Defendant exercised deadly force, he was no longer an "occupant" of the vehicle.

While the trial court was correct in its finding regarding "curtilage,"[2] the same cannot be said regarding its "occupant" reasoning. *See* N.C. Gen. Stat. § 14-51.2(a); *see also Campbell*, 285 N.C. App. at 486, 878 S.E.2d at 317; *Wirt*, 263 N.C. App. at 376, 822 S.E.2d at 673. Treating Defendant's account of the incident as true, upon our review of the material facts, and per our interpretation of the statutory castle doctrine, it cannot be said that Defendant was not an "occupant" of a motor vehicle at the time he exercised lethal force against Penny. *See* N.C. Gen. Stat. § 14-51.2(b); *see also Parks*, 264 N.C. App. at 115, 824 S.E.2d at 884.

As explicated above, N.C. Gen. Stat. § 14-51.2(b) expanded the applicability of the castle doctrine to the lawful occupant "of"—as opposed to "within"—a motor vehicle, and authorizes deadly force against an assailant who "had . . . entered" or "had removed" the lawful occupant from the vehicle. N.C. Gen. Stat. § 14-51.2(b), (b)(1); *see also Stevenson*, 81 N.C. App. at 412, 344 S.E.2d at 335; N.C. Gen. Stat. § 14-51.1 (repealed 2011). From this language—considered and interpreted as a whole—it is apparent that the General Assembly, in effecting expansion of the castle

---

[2] Under N.C. Gen. Stat. § 14-51.2(a), the statutory castle doctrine's use of "home" is defined as meaning, in relevant part, "[a] building or conveyance of any kind, to include its *curtilage*[.]" N.C. Gen. Stat. § 14-51.2(a)(1) (emphasis added). While "curtilage" is left undefined by the statute, our appellate courts have provided that, under the castle doctrine, "curtilage" includes a home's porch or driveway. *See Austin*, 279 N.C. App. at 382, 865 S.E.2d at 355 ("The statute's definition of 'home' includes the home's curtilage, such as the driveway at issue in this case[.]" (citing N.C. Gen. Stat. § 14-51.2(a)(1))); *see also State v. Frizzelle*, 243 N.C. 49, 51, 89 S.E.2d 725, 726 (1955) ("[T]he curtilage of the home will ordinarily be construed to include at least the yard around the dwelling house as well as the area occupied by barns, cribs, and other outbuildings." (citations omitted)).

doctrine's governance, contemplated situations where the lawful occupant "of" a motor vehicle uses justifiable force while no longer "within" the vehicle. *See* N.C. Gen. Stat. § 14-51.2(b), (b)(1); *see also Rankin*, 371 N.C. at 889, 821 S.E.2d at 792. This reading of N.C. Gen. Stat. § 14-51.2(b) is also consistent with the spirit of the statutory castle doctrine, informed by our appellate courts' prior, binding expositions: that a person is not bound to become a fugitive from his own motor vehicle, and as such, he is under no requirement to flee *or to remain in* his motor vehicle until his assailant is upon him. *See Stevenson*, 81 N.C. App. at 412, 344 S.E.2d at 335; *see also Blue*, 356 N.C. at 86–87, 565 S.E.2d at 138.

Here, taking Defendant's account of the incident as true and considering the evidence in the light most favorable to Defendant, Penny opened the passenger's side door of Defendant's vehicle and began to repeatedly punch Defendant in the face; Defendant observed Penny was armed with a gun; and Defendant managed to disarm Penny, who then resumed punching Defendant. *See Parks*, 264 N.C. App. at 115, 824 S.E.2d at 884. These facts demonstrate that, throughout this stage of the incident, Defendant was seated in the driver's seat of his vehicle, and at such time, Defendant was certainly a lawful occupant of his motor vehicle. *See* N.C. Gen. Stat. § 14-51.2(b). Defendant therefore was not bound to become a fugitive from his motor vehicle, and while under no obligation to flee, was *not* required to *remain in* the vehicle until Penny was "upon him." *See Blue*, 356 N.C. at 86–87, 565 S.E.2d at 138; *see also Stevenson*, 81 N.C. App. at 412, 344 S.E.2d at 335; *Austin*, 279 N.C. App. at 378, 865

S.E.2d at 352; *Vaughn*, ___ N.C. App. at ___, 901 S.E.2d at 265; *Benner*, 380 N.C. at 629, 869 S.E.2d at 205.

Next, after disarming Penny, and in retreat from Penny's relentless punches, Defendant exited through the vehicle's driver's side door and stood up; Penny came around to where Defendant stood and resumed his attack; and Defendant, while standing directly next to the driver's side door and still under attack from Penny, eventually discharged two lethal shots at Penny. Although Defendant was not "within" the vehicle when he shot Penny, as set forth above, Defendant was not required to remain in the vehicle to suffer Penny's attack, and the language and object of the statutory castle doctrine are such that, under certain circumstances, a defendant not "within" a motor vehicle may be afforded the benefits of the statute as a lawful occupant "of" the vehicle. *See* N.C. Gen. Stat. § 14-51.2(b), (b)(1); *see also Blue*, 356 N.C. at 86–87, 565 S.E.2d at 138; *Stevenson*, 81 N.C. App. at 412, 344 S.E.2d at 335; *Austin*, 279 N.C. App. at 378, 865 S.E.2d at 352; *Vaughn*, ___ N.C. App. at ___, 901 S.E.2d at 265; *Benner*, 380 N.C. at 629, 869 S.E.2d at 205.

Applying our statutory interpretation of the castle doctrine to the material facts of this case, under these *specific* circumstances—where Defendant retreated from his vehicle amidst an enduring attack, and exercised deadly force while standing directly next to the driver's side door, and still under attack—and viewing the evidence in the light most favorable to Defendant, we conclude that it would contravene the legislative intent of the statutory castle doctrine to find that

Defendant was not an "occupant" of his vehicle when he exercised deadly force. *See Campbell*, 285 N.C. App. at 486–87, 878 S.E.2d at 318; *see also Parks*, 264 N.C. App. at 115, 824 S.E.2d at 884. Moreover, as this Court presumes "that the legislature acted in accordance with reason and common sense and did not intend untoward results[,]" *see Romulus*, 216 N.C. App. at 34, 715 S.E.2d at 893, where the purpose of the statutory castle doctrine was to *expand* the circumstances under which one may use justified force, it cannot be the intended result of the legislature that Defendant, in exercising restraint and initially attempting to withdraw from Penny's attack, would be deprived the benefit of the statute. *See* N.C. Gen. § 14-51.2(b); *see also Stevenson*, 81 N.C. App. at 412, 344 S.E.2d at 335; *see also Blue*, 356 N.C. at 86–87, 565 S.E.2d at 138; *Austin*, 279 N.C. App. at 378, 865 S.E.2d at 352; *Vaughn*, ___ N.C. App. at ___, 901 S.E.2d at 265; *Rankin*, 371 N.C. at 889, 821 S.E.2d at 792. This Court will not adopt an interpretation that yields this "absurd and bizarre consequence[,]" *see Romulus*, 216 N.C. App. at 34, 715 S.E.2d at 893, and we find the trial court's denial of Defendant's instructional request on the ground that he was not an "occupant" to be in error. *See* N.C. Gen. § 14-51.2(b); *see also Parks*, 264 N.C. App. at 115, 824 S.E.2d at 884.

### 2. Unlawful and Forcible Entry

In determining instructional error, we next assess whether (1) Penny was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, Defendant's vehicle; and (2) Defendant knew or had reason to believe that

an unlawful and forcible entry or act was occurring or had occurred. *See* N.C. Gen. Stat. § 14-51.2(b)(1)–(2). Upon our de novo review of the Record, we conclude that both of these factors are met. *See Wirt*, 263 N.C. App. at 376, 822 S.E.2d at 673; *see also Parks*, 264 N.C. App. at 115, 824 S.E.2d at 884.

Treating Defendant's account of the incident as true, the Record demonstrates that Penny, without Defendant's invitation or consent, opened the passenger's side door of Defendant's car and began attacking Defendant, and after Defendant exited his vehicle, Penny came around the vehicle and continued to attack Defendant. *See Parks*, 264 N.C. App. at 115, 824 S.E.2d at 884. Viewing this evidence in the light most favorable to Defendant, we conclude the Record demonstrates: (1) at different points in time throughout the incident, Penny was forcefully and unlawfully entering, and had forcefully and unlawfully entered, Defendant's vehicle; and (2) Defendant knew, and had reason to believe, such entry was occurring and had occurred. *See* N.C. Gen. Stat. § 14-51.2(b)(1)–(2); *see also Parks*, 264 N.C. App. at 115, 824 S.E.2d at 884. As the Record demonstrates the existence of these two factors, Defendant was entitled to a statutory castle doctrine instruction, and the trial court's failure to provide such instruction amounted to instructional error. *See* N.C. Gen. Stat. § 14-51.2(b)(1)–(2); *see also Parks*, 264 N.C. App. at 115, 824 S.E.2d at 884.

## B. Prejudicial Error

Having concluded the trial court erred in failing to grant Defendant's request for a statutory castle doctrine instruction, we now determine whether the

instructional error was prejudicial to Defendant's case. *See Dilworth*, 274 N.C. App. at 61, 851 S.E.2d at 409; *see also Parks*, 264 N.C. App. at 115, 824 S.E.2d at 884. Upon our review of the Record, we discern this error to be prejudicial.

Regarding a statutory castle doctrine instruction, this Court has provided that, where a defendant shows by competent evidence that he was entitled to such instruction, he is "prejudiced by the trial court's failure to provide the requested instruction, because a person who uses permissible defense force pursuant to N.C. Gen. Stat. § 14-51.2 'is justified in using such force and is *immune from civil or criminal liability* for the use of such force.'" *State v. Kuhns*, 260 N.C. App. 281, 288, 817 S.E.2d 828, 832 (2018) (quoting N.C. Gen. Stat. § 14-51.2(e)) (cleaned up) (emphasis added); *see also* N.C. Gen. Stat. § 14-51.2(b). Per this standard, Defendant was prejudiced by the trial court's failure to provide the requested instruction.

The State, however, contends that there was no prejudicial error, as the Record demonstrates Penny had "discontinued all efforts" to enter Defendant's vehicle, and there was no question for the jury's consideration. *See* N.C. Gen. Stat. § 14-51.2(c)(5). This is a patently false statement of law. As explained above, the statutory castle doctrine functions as a burden-shifting provision, whereby "the defendant no longer has the burden to prove key elements of the traditional self-defense doctrine[,]" *Austin*, 279 N.C. App. at 380, 865 S.E.2d at 353, and is "*presumed* to have held a reasonable fear of imminent death or serious bodily harm to himself[.]" N.C. Gen. Stat. § 14-51.2(b) (emphasis added). Where a defendant demonstrates he is entitled

to a statutory castle doctrine instruction, the burden of proof shifts to the State, and "if the State presents substantial evidence from which a reasonable juror could conclude that [the] defendant did not have a reasonable fear of imminent death or serious bodily harm, the State can *overcome* the presumption and *create a fact question for the jury*." *Austin*, 279 N.C. App. at 384, 865 S.E.2d at 356 (emphasis added).

As such, whether the State presented substantial evidence in support of a finding that Penny "discontinued all efforts" to enter Defendant's vehicle is a question of fact reserved for the jury, and one which we will not consider on appeal. *See id.* at 384, 865 S.E.2d at 356; *see also* N.C. Gen. Stat. § 14-51.2(c)(5). Rather, we find that because Defendant has shown by competent evidence he was entitled to a statutory castle doctrine instruction, but for the trial court's instructional error, there is a reasonable possibility a different result would have been reached by the jury. *See Dilworth*, 274 N.C. App. at 61, 851 S.E.2d at 409; *see also Kuhns*, 260 N.C. App. at 288, 817 S.E.2d at 832; *Parks*, 264 N.C. App. at 115, 824 S.E.2d at 884. We therefore reverse the trial court's judgment and remand for a new trial, and we need not address Defendant's remaining argument regarding the trial court's excessive force instruction.[3] *See Kuhns* 260 N.C. App. at 288, 817 S.E.2d at 832 ("[W]e reverse the

---

[3] While we do not address Defendant's excessive force argument, we note that "in Castle Doctrine scenarios, unless the State rebuts the Castle Doctrine presumption, a jury cannot find that a defendant used excessive force." *State v. Phillips*, 290 N.C. App. 660, 664, 893 S.E.2d 256, 260 (2023) (citation omitted), *rev'd on other grounds*, 386 N.C. 513, 905 S.E.2d 23 (2024).

judgment entered upon the jury's verdict finding [the] defendant guilty of voluntary manslaughter and remand for a new trial. Because we have reversed and remanded for a new trial, we need not address [the] defendant's remaining arguments on appeal.").

## V. **Conclusion**

Upon careful review, we conclude Defendant has demonstrated by competent evidence that the trial court reversibly erred in denying his request for a statutory castle doctrine instruction. We therefore reverse the trial court's judgment, remand for a new trial on voluntary manslaughter and any lesser included offenses, and need not address Defendant's remaining argument.


NEW TRIAL.

Judge MURPHY concurs.

Judge STROUD concurs in result only by separate opinion.

Report per Rule 30(e).

No. COA24-50 – *State v. Williams*


STROUD, Judge, concurring in result only.

I concur in result only of the majority opinion. The majority opinion goes beyond what is necessary to resolve this case and may needlessly complicate the future interpretation and application of North Carolina General Statute Section 14-51.2. The statute states the instances when the presumption established by Section 14-51.2(b) should apply and under the evidence presented here, Defendant was entitled to the instruction. *See* N.C. Gen. Stat. § 14-51.2(b) (2023).

The majority opinion unnecessarily analyzes the definition of an "occupant" in determining whether Defendant should be afforded castle doctrine protections after he exited the vehicle. The statute itself is straightforward. Defendant was a "lawful occupant" of the vehicle as envisioned by the statute itself and there is no need for extensive statutory interpretation. Though Defendant was outside the vehicle when he fired the weapon, based on the evidence, taken in a light most favorable to Defendant, he was still protected as a lawful "occupant" of the vehicle under the statute when the shooting occurred because he was forced to get out of the vehicle by Penny's entering the vehicle to attack him and Penny had not abandoned the attack.

Essentially, the statute outlines three scenarios in which the lawful occupant

of a motor vehicle may use defensive and potentially deadly force: (1) someone is "in the process of unlawfully and forcefully entering" the occupant's motor vehicle; (2) someone had already "unlawfully and forcibly entered" the occupant's motor vehicle; or (3) someone has "removed or was attempting to remove another against that person's will" from the motor vehicle. *See* N.C. Gen. Stat. § 14-51.2(b)(1). Based on the language of the statute alone, an "occupant" of a motor vehicle is a person inside a motor vehicle at the time of an unlawful and forceful entry of the vehicle by another person. The statute addresses three scenarios which could be described as before, during, and after the unlawful and forceful entry into the motor vehicle by an intruder.

The evidence presented meets all the requirements under the second and third scenarios, during and after the entrance of the vehicle by the intruder. For the third scenario, the only question is if the "removal" of the occupant "against that person's will" must be the physical removal of the occupant from the vehicle, e.g., physically dragging him out of the car, or if the removal could occur because the occupant got out of the car to better protect himself during the attack. The State argues that Defendant may have the right to the instruction as to the presumption afforded to an "occupant" only if he was still inside the car:

> Defendant could have stayed in the driver seat after
> capturing the gun and fired either immediately or if
> [Penny] exited and relaunched his attack from outside the
> driver door. But [D]efendant instead elected to exit and
> engage [Penny] in the street. In such circumstances,

> [D]efendant was no longer an "occupant" for purposes of the defense of motor vehicle statute.

Based upon the State's argument, a lawful occupant would lose the protection of the statute by getting out of the vehicle even if the intruder pointed a gun at him from outside the car and demanded that he get out of the car. Even upon proper jury instructions, the jury could agree with the State and decide that Penny had abandoned the attack before Defendant got out of the car, but for purposes of jury instructions on a defense, we must view the evidence in the light most favorable to Defendant. "In determining whether the evidence is sufficient to entitle the defendant to jury instructions on a defense, the trial court must consider the evidence in the light most favorable to the defendant." *State v. Kuhns*, 260 N.C. App. 281, 284, 817 S.E.2d 828, 830 (2018) (citation omitted). And in that light, Defendant was the lawful occupant of the vehicle and Penny was physically entering the vehicle and began attacking him. Defendant saw Penny had a gun, the attack was ongoing, and Defendant got out of the vehicle not because he wanted to get out; the removal from the vehicle was against his will because he was still under attack and believed he would be in a better position to protect himself from Penny. Defendant's "removal" from the vehicle was forced by Penny's actions and he was entitled to the instruction on the presumption under North Carolina General Statute Section 14-51.2(b)(1).

Under these circumstances, the majority opinion's statutory interpretation of "lawful occupant" is unnecessary because the language of the statute is clear and

unambiguous. The discussion as to Defendant's "ownership" of the vehicle for purposes of determining whether castle doctrine protections should apply is unnecessary. The result would be the same had Defendant, for example, only been the passenger in someone else's car and Penny attacked him while inside that vehicle. And the discussion of "curtilage" is not relevant to a case dealing with a motor vehicle; motor vehicles are not stationary objects that can have a "curtilage" as a residence does. *See State v. Grice*, 367 N.C. 753, 759, 767 S.E.2d 312, 317 (2015) ("The curtilage is the area 'immediately surrounding and associated with the home.'" (quoting *Florida v. Jardines*, 569 U.S. 1, 6, 185 L.Ed.2d 495 (citation and quotation marks omitted))). In non-Fourth Amendment cases, our North Carolina Supreme Court has stated that "the curtilage of the home will ordinarily be construed to include at least the yard around the dwelling house as well as the area occupied by barns, cribs, and other outbuildings." *State v. Frizzelle*, 243 N.C. 49, 51, 89 S.E.2d 725, 726 (1955) (citations omitted).

The statute envisions the person claiming the presumption established by Section 14-51.2(b) starts as an "occupant" inside a car when someone forcefully and unlawfully enters from outside the vehicle. However, the statute also envisions a situation where an occupant may need to use force *outside* the car if he is removed in the course of the attack. The State agrees this is true but contends there was no question for the jury in this case because "the evidence [was] undisputed that [Penny] had discontinued his entry and exited." But the evidence was not so clear as the State

contends. As the majority notes, this evidence was disputed. Defendant argues that "the factual determination of whether Penny had discontinued all efforts to enter [Defendant's] car should have been decided by the jury." Viewed in the light most favorable to Defendant, Penny's assault outside the car was a direct continuation of an attempt to enter the car and to attack Defendant inside the car and a jury could reasonably have found that Penny had not "discontinued" all efforts to enter Defendant's car. Here, Defendant started as an occupant of the vehicle but was "removed" from the vehicle against his will because Penny forcefully entered the vehicle and attacked him. He did not lose his status as an "occupant" of the car for purposes of the instruction. A jury may or may not believe that Defendant would still have the benefit of the presumption after he got out of the car, since the jury may not believe Penny had a gun, or they may believe Penny had discontinued his attack before Defendant got out, but Defendant was entitled to the instruction.

For these reasons, I concur in result only.